STATE OF NEBRASKA, APPELLEE, V.
LORA L. MCKINNEY, APPELLANT.
730 N.W.2d 74

Filed April 13, 2007. No. S-05-591.

Jerry L. Soucie and James R. Mowbray, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and Corey M. O'Brien for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

CONNOLLY, J.

On April 8, 2003, following an investigation that lasted over 5 years, a grand jury returned an indictment of Lora L. McKinney for the murder of Harold L. Kuenning. A jury convicted McKinney of first degree murder. The district court sentenced McKinney to life imprisonment.

## I. STATE'S AND McKINNEY'S THEORIES

The State advanced the theory that Kuenning picked up McKinney, his former girlfriend, from the home of a friend. From there, the couple drove to Kuenning's cabin in rural Seward County, Nebraska. Once at the cabin, McKinney shot Kuenning with his own revolver, stole several guns from him, and drove his van back to Lincoln, Nebraska. The State claimed that McKinney's motive was either money or a belief that Kuenning

was responsible for placing McKinney's 3-year-old daughter into foster care.

McKinney's theory focused on other suspects, including Terri Fort, who McKinney claims had an ongoing sexual relationship with Kuenning, and Joseph Walker, McKinney's former boyfriend. McKinney also points to evidence that showed Fort and Walker stayed in Lincoln in a hotel room registered to Fort within hours of the murder. In the hotel room, law enforcement officers later found a firearm registered to Kuenning; law enforcement could not exclude the firearm as the murder weapon.

## II. THE INVESTIGATION: LAW ENFORCEMENT INTERVIEWS McKINNEY AND COLLECTS HER DNA

On January 6, 1998, at around 5 p.m., a neighbor discovered Kuenning's body in Kuenning's cabin. Kuenning died from three gunshot wounds. The evidence established that Kuenning died sometime between 9:30 p.m. on January 5 and 5:30 a.m. on January 6. From the bullets retrieved from Kuenning's body, the Nebraska State Patrol determined that the perpetrator killed Kuenning with either a .38- or .357-caliber weapon.

On January 7, 1998, law enforcement discovered Kuenning's van parked about two blocks from Fort's home. The officers found McKinney's fingerprint near the door handle on the driver's side. They performed a fingerprint analysis on items found in Kuenning's cabin, including a Newport cigarette package and a purse found on Kuenning's bed; McKinney's fingerprints appeared on both those items. In addition, DNA testing performed on beer cans, soda cans, and cigarette butts found in the cabin revealed McKinney's DNA on a soda can. Law enforcement also found a mixture of Kuenning's and McKinney's DNA on three of the recovered cigarette butts.

Law enforcement also discovered unknown DNA present on a spent bullet recovered at the scene and an unidentified palm print on a Newport cigarette package. At trial, a fingerprint examiner's testimony excluded McKinney and other suspects as the source of that print, but did not exclude Kuenning.

Sometime before his death, someone stole from Kuenning a Ruger .44 Magnum revolver and a Colt .357 Magnum revolver. Law enforcement eventually recovered the guns, and

Kuenning picked them up from the Lincoln Police Department on January 5, 1998. Law enforcement did not find these weapons in either Kuenning's van or cabin following his death. Law enforcement recovered the .44 Magnum revolver after a traffic stop in Omaha, Nebraska, about 7 months after the murder, and law enforcement found the .357 Magnum in a room at a Holiday Inn Express located at 11th Street and Cornhusker Highway in Lincoln. A .38-caliber revolver registered to Kuenning was never recovered.

During the investigation in 1998, officers interviewed McKinney on January 8, 15, and 19. The court admitted these statements into evidence. In the January 8 interview, McKinney discussed her relationship with Kuenning. She stated that she had not seen Kuenning during the previous 2 to 3 weeks. In the January 15 statement, McKinney again stated she had not seen Kuenning since before Christmas.

On January 19, 1998, while in custody on a drug charge, officers again interviewed McKinney. During that interview, McKinney acknowledged that she had lied to officers on January 8 and 15 when she stated that she had not seen Kuenning since before Christmas. McKinney admitted that she saw Kuenning on January 5 at Fort's home, that she had a conversation with Kuenning in Kuenning's van in Fort's driveway, and that she and Kuenning later drove around a while in Kuenning's van. During that interview, she stated that she remembered being at a Save Mart grocery store with Walker "on Monday night," which was the night that Kuenning was last seen alive. McKinney also indicated that she had spent Tuesday night at a hotel with Walker. Finally, during that interview, she admitted to having stolen a .44 Magnum revolver from Kuenning on January 5, but stated that it was the only gun she took.

Both Fort and Walker testified. Fort testified that McKinney left with Kuenning on the evening of January 5, 1998, and did not return to Lincoln until the early morning hours of January 6. Fort also testified that she and Walker had been together at a Holiday Inn Express hotel located at 11th Street and Cornhusker Highway in Lincoln in the early morning hours of January 6.

Walker testified that he saw McKinney in either the late evening hours of January 5, 1998, or the early morning hours of January

6. Although some of the details varied, Walker's testimony was generally consistent with Fort's regarding the stay at the hotel. Walker also testified that at that time he saw McKinney either late January 5 or early January 6, McKinney told him that she had shot or killed Kuenning and that she needed help disposing of some guns.

Regarding the disposal of the guns, Fort's son testified that McKinney had tried to sell him a gun in exchange for some crack cocaine, but that he refused. And another individual testified that McKinney tried to sell him a gun, but that he had also refused. McKinney, however, was successful in exchanging, with James Cheatham, a .44 Magnum revolver for some crack cocaine. Cheatham testified he later sold the gun in Omaha.

## III. ASSIGNMENTS OF ERROR

McKinney argues that the district court erred in (1) denying her motion to suppress her DNA sample taken under the identifying physical characteristics statutes (IPCS)[1]; (2) denying her motion to obtain DNA from other suspects under a subpoena duces tecum; (3) denying her motion to suppress her statements made to law enforcement; (4) admitting Fort's testimony and other evidence obtained because of Fort's testimony; and (5) denying her motion to dismiss the indictment, motion for mistrial, and motion to strike certain testimony because of the release of grand jury testimony.

## IV. ANALYSIS

### 1. The District Court Erred When It Failed to Suppress McKinney's DNA

#### (a) Probable Cause Is Required for Searches Under § 29-3304

##### (i) Searches of Arrestees

McKinney argues that the district court erred in not suppressing her DNA evidence from the buccal swab and her pubic hair. She claims the search violated the IPCS and the Fourth Amendment.

---

[1] Neb. Rev. Stat. §§ 29-3301 to 29-3307 (Reissue 1995).

On June 9, 1998, the State obtained an order under § 29-3303 to collect evidence identifying McKinney's physical characteristics, including blood, hair, and buccal swab samples. When the State executed the order, McKinney was serving a sentence on a misdemeanor—second degree forgery. She moved to suppress that physical evidence, alleging that the seizure lacked probable cause. The district court determined that the order lacked probable cause. The court nevertheless refused to suppress the physical evidence. It concluded that under § 29-3304, law enforcement did not require a court order to collect McKinney's DNA. Section 29-3304 provides:

No order shall be required or necessary where the individual has been lawfully arrested, nor under any circumstances where peace officers may otherwise lawfully require or request the individual to provide evidence of identifying physical characteristics, and no order shall be required in the course of trials or other judicial proceedings.

■ Interpretation of the IPCS presents a question of law, and we resolve questions of law independently of the trial court's conclusions.[2]

The State claims that under § 29-3304, law enforcement did not need a court order because McKinney had been arrested and convicted of attempted forgery. McKinney, however, argues that the court's interpretation of § 29-3304 sweeps too broadly because it would allow any arrest to negate the probable cause requirement for a search and seizure. McKinney argues that a showing of "probable cause" must relate to the offense under investigation. That is, only if the officers had arrested McKinney for murder—the crime for which the DNA is sought—would the exception in § 29-3304 apply. McKinney argues that to hold otherwise would "gut the other protections contained in the IPC[S] and make the Fourth Amendment irrelevant."[3] McKinney does not assign as error that § 29-3304 is unconstitutional, so we do not address that issue. But she does argue that any seizure of her identifying information without a showing of probable cause violates the Fourth Amendment.

---

[2] See *State v. Marrs*, 272 Neb. 573, 723 N.W.2d 499 (2006).

[3] Brief for appellant at 39.

██ The Fourth Amendment to the U.S. Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Probable cause to search requires that the known facts and circumstances are sufficient to warrant a person of reasonable prudence in the belief that contraband or evidence of a crime will be found.[4] And a search or seizure of a person must be supported by probable cause particularized to that person.·

██ DNA collection under the IPCS is unquestionably a search and seizure for Fourth Amendment purposes.[5] As the U.S. Supreme Court stated in *United States v. Dionisio*,[6] "the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels—the 'seizure' of the 'person' necessary to bring him into contact with government agents . . . and the subsequent search for and seizure of the evidence."

██ The Fourth Amendment prohibits seizure of nontestimonial identification evidence under the IPCS unless police have probable cause to believe that the person seized and compelled to provide physical characteristics evidence committed the crime under investigation. In *State v. Evans*,[7] we addressed the validity of § 29-3303 of the IPCS, which allows the collection of evidence identifying a person's physical characteristics upon the issuance of an order. Under an older version of the IPCS,

---

[4] See *State v. Voichahoske*, 271 Neb. 64, 709 N.W.2d 659 (2006).

[5] See *Nicholas v. Goord*, 430 F.3d 652 (2d Cir. 2005) (buccal swab). See, also, *Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 122 S. Ct. 2559, 153 L. Ed. 2d 735 (2002) (urine); *Cupp v. Murphy*, 412 U.S. 291, 93 S. Ct. 2000, 36 L. Ed. 2d 900 (1973) (fingernail scrapings); *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966) (blood test).

[6] *United States v. Dionisio*, 410 U.S. 1, 8, 93 S. Ct. 764, 35 L. Ed. 2d 67 (1973), citing *Schmerber v. California, supra* note 5.

[7] *State v. Evans*, 215 Neb. 433, 338 N.W.2d 788 (1983).

§ 29-3303 required only probable cause that a crime had been committed. In *Evans*, we read into the act the additional requirement that probable cause must exist to believe that the person being compelled to submit to the order committed the crime under investigation. In 2005, the Legislature amended § 29-3303 to specifically set forth this probable cause requirement.[8]

■ When faced with a statute which is susceptible of two constructions, one of which is valid and the other which would be unconstitutional or of doubtful validity, we will adopt the construction which results in the statute's validity.[9] If we interpreted § 29-3304 to allow law enforcement to obtain identifying information under the IPCS whenever a person is lawfully arrested for any offense, it would snuff out probable cause—the oxygen for the Fourth Amendment. Such an expansive interpretation would permit the warrantless collection and profiling of DNA from any citizen including those arrested for misdemeanors and even traffic violations. Searches of arrestees would be permissible without requiring law enforcement to show any nexus between the arrestee and the crime for which his or her DNA is sought. The trial court's interpretation would require a citizen arrested for littering to submit to invasive bodily procedures in a search for evidence of any crime.

### (ii) Searches When Otherwise Lawfully Required or Requested: Convictions and Incarcerations

But this does not end our inquiry because here, McKinney had been convicted and incarcerated—not merely arrested—when the officers took her DNA. McKinney's incarceration implicates the part of § 29-3304 that allows DNA to be taken when "peace officers may otherwise lawfully require or request the individual to provide evidence of identifying physical characteristics." And we recognize that a person necessarily gives up some constitutional protection when a defendant is imprisoned. Thus, we consider whether probable cause is also required under § 29-3304 when a person is incarcerated.

---

[8] See 2005 Neb. Laws, L.B. 361 (effective April 28, 2005).

[9] See *State v. Rabourn*, 269 Neb. 499, 693 N.W.2d 291 (2005).

· We find guidance in court decisions that have analyzed the constitutionality of the federal DNA Analysis Backlog Elimination Act of 2000 (Federal DNA Act)[10] and similar state statutes.[11] These statutes provide for the collection and databasing of DNA samples from persons who have been convicted of certain offenses.[12] Courts have nearly unanimously upheld these statutes against Fourth Amendment challenges.[13]

▮ The majority of courts address whether the searches permitted by DNA statutes are reasonable, because the Fourth Amendment only applies to unreasonable searches.[14] Under this approach, the court balances the intrusion upon an individual's privacy with the need to promote legitimate governmental interests.[15] A minority of courts have analyzed the issue under a "special needs" approach, examining whether special needs justify the search and seizure.[16]

Regarding the Federal DNA Act, the Eighth Circuit Court of Appeals applied the reasonableness standard and concluded that the act was constitutional.[17] In *U.S. v. Kraklio*, a convicted felon who was on probation challenged the Federal DNA Act under the Fourth Amendment. The court adopted the reasoning of the Third Circuit Court of Appeals in *U.S. v. Sczubelek*.[18] In *Sczubelek*, the Third Circuit balanced the rights of a felon on supervised release with the government's interest in collecting his DNA. The court concluded that the government could collect DNA under the Federal DNA Act without probable cause.

---

[10] 42 U.S.C. §§ 14135 to 14135e (2000 & Supp. III 2003).

[11] See, e.g., Maryland's DNA collection statutes, Md. Code Ann., Pub. Safety §§ 2-504 to 2-512 (LexisNexis 2003 & Supp. 2006).

[12] See, e.g., *id.*; 42 U.S.C. §§ 14135 to 14135e.

[13] See *State v. Raines*, 383 Md. 1, 857 A.2d 19 (2004) (listing cases).

[14] See *U.S. v. Kraklio*, 451 F.3d 922 (8th Cir. 2006).

[15] *Id.*, citing *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001).

[16] See, e.g., *Nicholas v. Goord, supra* note 5.

[17] *U.S. v. Kraklio, supra* note 14.

[18] *U.S. v. Sczubelek*, 402 F.3d 175 (3d Cir. 2005).

The court found that the defendant had a reduced right to privacy because of his conviction. The court determined that DNA collection is only minimally intrusive.[19] It further found that the government has "a compelling interest in the collection of identifying information of criminal offenders" and that a "DNA database promotes increased accuracy in the investigation and prosecution of criminal cases."[20] This government interest outweighed convicts' diminished rights. The court cited as an additional factor the Federal DNA Act's specificity in delineating offenses for which a sample must be taken. Thus, officials do not have discretion to single out individuals for sampling. Further, the Federal DNA Act limits the permissible uses of DNA.[21]

In contrast to the DNA statutes requiring DNA collection for storage and profiling, § 29-3304 does not serve the important government interest of establishing a DNA database. Here, law enforcement did not take McKinney's DNA for databasing. Instead, they took it solely for the investigation of a particular crime for which the district court found that the officers did not have probable cause to believe McKinney was involved. Further, a critical distinction exists between § 29-3304 and DNA databasing statutes: § 29-3304 does not limit the offenders to whom it applies. Without a probable cause requirement, § 29-3304 would permit law enforcement personnel, at their whim, to take DNA from any incarcerated person. In contrast, DNA databasing statutes do not allow law enforcement to single out any particular offender.

Although an imprisoned person has diminished rights to privacy, the cases that have addressed DNA collection acts have involved only felonies, or other serious crimes.[22] In finding that felons have a lesser privacy interest, courts have concluded that

---

[19] *Id.* See, also, *Green v. Berge*, 354 F.3d 675 (7th Cir. 2004); *Shaffer v. Saffle*, 148 F.3d 1180 (10th Cir. 1998); *Gaines v. State*, 116 Nev. 359, 998 P.2d 166 (2000).

[20] *U.S. v. Sczubelek, supra* note 18, 402 F.3d at 185.

[21] *U.S. v. Sczubelek, supra* note 18. See, also, *Green v. Berge, supra* note 19.

[22] See, e.g., *U.S. v. Sczubelek, supra* note 18; *Green v. Berge, supra* note 19; *U.S. v. Kraklio, supra* note 14.

once a person has been convicted of a felony, the government has a compelling interest in his or her identity to protect the public from recidivists and to solve past and future crimes.[23] We acknowledge that courts have found a diminished right to privacy under DNA collection statutes, even when the DNA is taken from felons released on probation.[24] But the district court applied § 29-3304 to a person convicted of a minor offense—misdemeanor forgery. The government's interest in identifying misdemeanants is not as compelling as its interest in identifying convicted felons.

Applying the reasonableness test to § 29-3304, we conclude that the government interest in taking DNA for a particular crime—without individualized probable cause—does not outweigh McKinney's privacy interest.

### (b) Probable Cause Is Required Under Nebraska's DNA Act

Comparing § 29-3304 to Nebraska's DNA Identification Information Act (DNA Act)[25] and Neb. Rev. Stat. § 29-4126 (Cum. Supp. 2006) further supports our decision. Nebraska's DNA Act provides that DNA samples shall be collected for a state DNA databank from persons who have been convicted of certain enumerated offenses.[26] Offenses that subject a person to DNA collection include felony sex offenses, such as incest of a minor; first or second degree sexual assault; or first, second, or third degree sexual assault of a child, as well as other specified offenses. Specified offenses include first or second degree murder, manslaughter, stalking, burglary, or robbery.[27] But in § 29-4126, the Legislature provided limitations on obtaining and using DNA samples. Section 29-4126 provides: "Notwithstanding any other provision of law: (1) No DNA sample shall be obtained from any person for any law enforcement purpose in connection with an investigation of a crime without probable cause, a court order, or

---

[23] See *U.S. v. Sczubelek, supra* note 18.

[24] See *Green v. Berge, supra* note 19 (Easterbrook, Circuit Judge, concurring).

[25] Neb. Rev. Stat. §§ 29-4101 to 29-4115 (Cum. Supp. 2006).

[26] See §§ 29-4102 and 29-4106.

[27] § 29-4103(6) and (8).

voluntary consent . . . ." Thus, under this provision, even some-
one subject to DNA collection under the DNA Act cannot be
forced to provide a sample *for an investigation* without probable
cause, a court order, or voluntary consent.

Having been incarcerated for misdemeanor forgery, McKinney
would not be subject to the DNA Act for databasing her DNA.
And under § 29-4126, law enforcement could not have obtained
DNA from her for an investigation. Although this provision was
not in effect at the time the officers took McKinney's DNA, it
nevertheless bolsters our conclusion. Section 29-4126 mandates
probable cause when collecting DNA, even when the person
subject to DNA collection has been convicted of serious felonies.
Interpreting § 29-3304 to permit DNA collection from a person
convicted of a misdemeanor would be inconsistent with the pro-
tections of § 29-4126, which apply regardless of the offense a
person has committed.

We conclude that under § 29-3304, law enforcement personnel
must have probable cause to believe that the person whose DNA
is sought—whether he or she has been arrested or may otherwise
be subject to DNA testing—committed the crime for which the
DNA is sought. Although McKinney had been arrested, con-
victed, and imprisoned for forgery, the district court found no
probable cause to support the order for McKinney's DNA in the
murder investigation. The State does not challenge the district
court's finding that the order authorizing the DNA collection
lacked probable cause, nor does it argue that some other ground
supports the introduction of the physical evidence. Therefore, we
conclude that the district court erred in admitting McKinney's
DNA.

## 2. The Admission of McKinney's DNA Was Harmless Error

 Having concluded that the district court erred in ad-
mitting McKinney's DNA, we now determine whether that error
was harmless. In a jury trial of a criminal case, an erroneous
evidentiary ruling results in prejudice to a defendant unless the
State demonstrates that the error was harmless beyond a reason-
able doubt.[28] Harmless error exists when there is some incorrect

[28] *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006).

conduct by the trial court which, on review of the entire record, did not materially influence the jury's verdict adversely to a defendant's substantial right.[29] In a harmless error review, we look at the evidence upon which the jury rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the guilty verdict rendered in the trial was surely unattributable to the error.[30]

We recognize the potency of DNA evidence and its effect on jurors. We believe, however, that its significance was diminished because the presence of McKinney's purse and fingerprints also placed her at Kuenning's residence on the night of the murder. Further, other evidence properly admitted supported the jury's verdict. Fort testified that McKinney left Fort's Lincoln home with Kuenning the evening of January 5, 1998. Other testimony indicates that McKinney was not seen again in Lincoln until the late evening hours of January 5 or the early morning hours of January 6. Walker testified that at that time, McKinney told him that she had just shot or killed Kuenning.

The evidence also shows that McKinney requested that Walker help her dispose of some guns and that she tried to sell some guns to several individuals around the time of Kuenning's death. Cheatham testified that McKinney, in exchange for drugs, gave him a .44 Magnum revolver which he eventually sold in Omaha; law enforcement later recovered a .44 Magnum revolver registered to Kuenning in Omaha. This weapon was one of two that Kuenning had retrieved from the Lincoln Police Department the day of Kuenning's death. Although McKinney did admit to stealing the .44 Magnum from Kuenning, she denied taking any other gun. However, the other weapon, a .357 Magnum revolver, was found in the Holiday Inn Express hotel room in which Fort and Walker had stayed. Moreover, in one of her interviews with the officers, McKinney admitted that she had stayed with Walker in a hotel room; while it is not clear from the record which hotel, she does mention that she went with Walker to a Save Mart grocery store on the evening of Kuenning's death. According to the

---

[29] *Id.*

[30] See *id.*

record, a Save Mart grocery store is located across the street from the Holiday Inn Express. Law enforcement eventually recovered the .357 Magnum revolver.

McKinney also acknowledged in her interviews with the officers that she had lied about having seen Kuenning before his death. We conclude from the entire record that the jury's verdict was surely unattributable to the erroneous admission of McKinney's DNA, and that error was therefore harmless.

### 3. THE COURT DID NOT ERR IN DENYING McKINNEY'S MOTION TO OBTAIN DNA FROM OTHER SUSPECTS

McKinney argues that the district court erred in not granting her motion for subpoena duces tecum for obtaining DNA samples from State witnesses. McKinney sought DNA from Fort, Walker, and three other individuals. The district court denied the motion. It stated that it had "found no statutory authority directly and clearly supporting an order of the type requested" and that "even though the motion came from the defense, the requested order would come from the court, a form of state action. This court cannot simply order people to submit to seizures without any factual basis to support such orders."

As authority for her right to obtain such samples, McKinney relies on Neb. Rev. Stat. § 29-1917 (Reissue 1995). Section 29-1917(1) provides that in certain criminal cases, "the defendant may request the court to allow the taking of a deposition of any person . . . who may be a witness in the trial of the offense." Section 29-1917 further provides that "[t]he court may order the taking of the deposition when it finds the testimony of the witness . . . [m]ay be material or relevant to the issue to be determined at the trial of the offense[.]" Also McKinney directs us to Neb. Rev. Stat. § 25-1224 (Reissue 1995), which provides for the issuing of the subpoena duces tecum to a witness, requiring him to appear to testify and further bring with him any "book, writing or other thing under his control." Essentially, McKinney contends that she has the right to depose the State's witnesses and, at that time, require them to provide a DNA sample, because the witnesses' DNA is a "thing under [their] control."

Statutory interpretation presents a question of law, and we resolve such issues independently of the lower court's

conclusions.[31] And we give statutory language its plain and ordinary meaning.[32]

We disagree that §§ 29-1917 and 25-1224 provide authority for the discovery sought by McKinney. Section 25-1224 provides that the person to whom the subpoena is issued may be required to provide "any book, writing or other thing." Under the ejusdem generis canon of construction, when a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed.[33] We read § 25-1224 to include only those "thing[s]" that are documentary in nature. DNA does not fit into such a list.[34]

In addition to her statutory argument, McKinney asserts that "[a] criminal defendant has a Sixth and Fourteenth Amendment right to prepare and present a defense using the subpoena power where there is a plausible showing of materiality and relevance."[35] McKinney relies upon the Compulsory Process Clause of the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."[36] In support of this argument, McKinney directs this court to *In re Jansen*, where the court held that under the Massachusetts equivalent of a subpoena duces tecum, a third party could be compelled to produce a DNA sample upon the proper showing by a defendant. The court concluded that the Massachusetts Constitution, which provides a criminal defendant the right "'to produce all proofs . . . that may be favorable to him,'" provides authority for such a request.[37] In doing so, the court dismissed claims that obtaining the third

---

[31] See *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

[32] *Id.*

[33] *Nebraska Liq. Distrib. v. Nebraska Liq. Cont. Comm.*, 269 Neb. 401, 693 N.W.2d 539 (2005).

[34] But see *In re Jansen*, 444 Mass. 112, 826 N.E.2d 186 (2005), *abrogated on other grounds, Com. v. Dwyer*, 448 Mass. 122, 859 N.E.2d 400 (2006).

[35] Brief for appellant at 29.

[36] U.S. Const. amend. VI.

[37] See *In re Jansen, supra* note 34, 444 Mass. at 115-16, 826 N.E.2d at 190.

party's DNA violated the third party's Fourth Amendment rights. We, however, find *In re Jansen* of limited applicability because the court relied on a right under the Massachusetts Constitution which is much broader than any rights provided under the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution.

More instructive is *Bartlett v. Hamwi*.[38] In *Bartlett*, the defendant sought discovery of hair samples from a witness for the prosecution. Though noting that prior case law indicated that there may be some instances when such discovery was permissible, the court held that it was not presented with such an instance. The court noted that Fourth Amendment protections extended to third parties.

> [The case] involves a request by a defendant that evidence be extracted from the body of a witness. No criminal rule of procedure or statute specifically authorizes samples to be taken from witnesses or authorizes physical examinations of witnesses. . . .
>
> . . . .
>
> Certainly a witness, who is not a suspect, defendant or victim, should have no *less* protection against bodily intrusion than defendants or suspects in criminal cases. Although this case involves a defendant's request for evidence, nevertheless, a witness is still protected by the guarantees under . . . the Fourth Amendment to the United States Constitution, as well as constitutional rights to privacy guaranteed by . . . the United States Constitution.[39]

As in *Bartlett*, Nebraska has no rule or statute authorizing the discovery sought by McKinney. Furthermore, we would have to balance the constitutional rights of those third parties from whom McKinney seeks to compel DNA samples. Those rights must be balanced against any rights McKinney might have in putting forth her defense. We conclude, as the court in *Bartlett* did, that "[t]he circumstances presented here do not constitute a 'rare instance' where justice may require an invasion of a witness' privacy rights or an invasion of [a third party's] Fourth

---

[38] *Bartlett v. Hamwi*, 626 So. 2d 1040 (Fla. App. 1993).

[39] *Id.* at 1042-43 (emphasis in original).

Amendment rights."[40] We conclude that the district court did not err in denying McKinney's motion to obtain DNA samples from certain witnesses.

## 4. THE COURT DID NOT ERR IN ADMITTING McKINNEY'S STATEMENTS

McKinney argues that the district court erred by not granting her motion to suppress statements made to the officers. McKinney directs us to two separate interviews on January 15 and 19, 1998, which she contends violated her Fifth and Sixth Amendment rights. We note that the first conversation between McKinney and law enforcement occurred on January 8. McKinney, however, does not argue on appeal that any statements from this interview should be suppressed.

Officers contacted McKinney on January 15, 1998. Two investigators drove McKinney to Nebraska State Patrol offices for an interview. During this interview, McKinney discussed her relationship with Kuenning and stated that she had not seen him since before Christmas.

Officers again contacted McKinney at the Seward County jail on January 19, 1998, while McKinney was in custody on a drug possession charge. Officers gave McKinney the *Miranda* warnings during this interview. McKinney acknowledged that she had lied to officers on January 15 when she stated that she had not seen Kuenning since before Christmas. McKinney admitted that she saw Kuenning on January 5 at Fort's home, that she had a conversation with Kuenning in Kuenning's van in Fort's driveway, and that she and Kuenning later drove around a while in Kuenning's van.

### (a) January 15 Interview

The State does not dispute that the officers did not give McKinney her *Miranda* warnings before the January 15, 1998, interview. McKinney argues that at several points throughout the interview, she indicated that she wanted to leave, but that the officers continued to question her. In her brief and again at oral argument, McKinney specifically referred this court to an exchange during this interview when one of the investigators told

---

[40] See *id.* at 1043.

her to "[s]it down." McKinney now argues that the district court should have suppressed any statement made after she indicated that she wished to leave because she did not receive a *Miranda* warning. *Miranda v. Arizona*[41] prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.[42] *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.[43] *Miranda* warnings, however, are required only when there has been such a restriction on one's freedom as to render one "in custody."[44] And one is in custody for purposes of *Miranda* when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest.[45] Two inquiries are essential to the determination whether an individual is in custody for *Miranda* purposes: (1) an assessment of the circumstances surrounding the interrogation and (2) whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.[46]

In *Mata*, this court, citing *U.S. v. Axsom*,[47] applied "'six common indicia of custody which tend either to mitigate or aggravate the atmosphere of custodial interrogation.'"[48] We noted that in *Axsom*, the Eighth Circuit Court of Appeals described three indicia as mitigating against the existence of custody at the time of questioning: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect

---

[41] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[42] *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003).

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *U.S. v. Axsom*, 289 F.3d 496 (8th Cir. 2002).

[48] *Mata, supra* note 42, 266 Neb. at 682, 668 N.W.2d at 466.

possessed unrestrained freedom of movement during questioning; or (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions.[49] The Eighth Circuit described the remaining three indicia as aggravating the existence of custody if present: (1) whether strong-arm tactics or deceptive stratagems were used during questioning, (2) whether the atmosphere of the questioning was police dominated, or (3) whether the suspect was placed under arrest at the termination of the proceeding.[50]

Having reviewed the tapes from McKinney's January 15, 1998, interview, a copy of the transcript, and the officer's testimony, we conclude all three mitigating indicia are present. From the start, the investigators told McKinney that she was not required to talk with them and that she could leave at any time. At several points during the interview, investigators again told McKinney she could leave at any time. The officers left the door to the interview room open; one of the officers testified that it probably was closed at some points during the interview, but that it was never locked. The record reveals no evidence that the investigators restricted McKinney's movement during the interview. Finally, the officers testified, and McKinney does not otherwise contend, that she voluntarily went to the Nebraska State Patrol offices for the interview. Regarding the allegation that an investigator told McKinney to "sit down," a review of the taped interview shows that when the investigator told McKinney to "sit down," she was getting upset and the investigator attempted to calm her.

Concerning the aggravating factors, the interview did take place at the offices of the Nebraska State Patrol and this would suggest that the atmosphere was "police dominated." But the officers did not use any strong-arm tactics or deception. Moreover, the officers permitted McKinney to leave at the end of questioning and, in fact, drove her home. The officers did not arrest her at the conclusion of that interview, or even on the day of the interview. Upon our de novo review of the record, we conclude, as did the district court, that a reasonable person would have been aware that she was free to leave. The district court correctly concluded

---

[49] Id.

[50] Id.

that McKinney was not in custody at the time of the January 15, 1998, interview.

▮ To the extent that McKinney argues that the officers should have given her *Miranda* warnings because it was clear that she wished to invoke her right to be silent, we note *Mata* presented a similar argument. In *Mata*, we concluded that the defendant could not anticipatorily invoke his *Miranda* rights prior to or outside the context of custodial interrogation.[51] Because McKinney was not in custody, the officers were not required to give her *Miranda* warnings. McKinney's argument concerning the January 15, 1998, interview is without merit.

### (b) January 19 Interview

McKinney also argues that the district court erred in not suppressing her entire statement with the Nebraska State Patrol officers on January 19, 1998. McKinney argues that because she invoked her right to counsel at the end of the January 15 interview, the officers could not initiate further contact with her. McKinney directs this court to *Edwards v. Arizona*,[52] which rule governing subsequent waivers of an accused's invoked right to counsel we adopted in *State v. Smith*.[53] In *Edwards*, the U.S. Supreme Court held that

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.[54]

---

[51] *Mata, supra* note 42.

[52] *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

[53] *State v. Smith*, 242 Neb. 296, 494 N.W.2d 558 (1993).

[54] *Edwards, supra* note 52, 451 U.S. at 484-85.

We find *Edwards* and *Smith* to be inapplicable to the January 19, 1998, interview. The protections offered by *Edwards* are not available to McKinney, because at the time she allegedly requested counsel, she was not in custody.[55] Moreover, as previously stated, one cannot anticipatorily invoke *Miranda* rights.[56] Thus, McKinney could not have requested counsel during a *noncustodial* interview with the expectation that such a request would be honored if she were eventually placed in custody. McKinney's argument concerning the January 19 interview is also without merit.

We conclude that on January 15, 1998, McKinney was not in custody for purposes of *Miranda*. Thus, the district court did not err in admitting into evidence statements made by McKinney during her January 15 and 19 interviews.

### 5. Fort Was Not an Undercover Agent in Violation of Neb. Rev. Stat. § 29-2262.01 (Reissue 1995); Her Testimony Was Admissible

McKinney argues that the district court erred in admitting Fort's testimony. McKinney contends that the State violated § 29-2262.01 by paying Fort a "salary" while Fort was an inmate in custody. Section 29-2262.01 provides:

> A person placed on probation by a court of the State of Nebraska, an inmate of any jail or correctional or penal facility, or an inmate who has been released on parole, probation, or work release shall be prohibited from acting as an undercover agent or employee of any law enforcement agency of the state or any political subdivision. Any evidence derived in violation of this section shall not be admissible against any person in any proceeding whatsoever.

We have held that the plain and ordinary meaning of § 29-2262.01 prohibits those placed on probation by a court of this state and inmates who have been released on parole by any court from acting as undercover agents for, or employees of, law enforcement agencies. The exclusionary rule provided by this section does not

---

[55] See *U.S. v. Arrington*, 215 F.3d 855 (8th Cir. 2000), citing *Arizona v. Roberson*, 486 U.S. 675, 108 S. Ct. 2093, 100 L. Ed. 2d 704 (1988).

[56] *Mata, supra* note 42.

apply unless the informant is both (1) in jail, on probation, or on parole and (2) acting as an undercover agent or employee of a law enforcement agency.[57]

On August 17, 1998, while McKinney was incarcerated on a drug charge, Robert Frank, a criminal investigator, interviewed Fort. Frank testified that he sought to interview Fort because police found a gun owned by Kuenning in a hotel room registered to Fort within a few hours of Kuenning's death. The transcript of this interview shows that Frank and Fort discussed the events surrounding Kuenning's death. At the conclusion of the interview, Frank asked Fort whether she needed anything. Fort responded that she needed cigarettes, but that she could not get any money out of her account for a few days. At that point, Frank gave Fort $20 for cigarettes. The record shows that Frank's supervisor advised Frank to seek reimbursement for the $20 he gave to Fort. Eventually, reimbursement was obtained, and the $20 was coded in law enforcement records as "salary."

Frank returned on August 18, 1998, to again interview Fort, as well as to approach her about becoming a paid informant for law enforcement following her release from custody. During that interview, Frank made it clear to Fort that she would be ineligible for paid status while she was in jail, and even upon release, if she was released on probation or parole. At that interview, there was a brief exchange between Frank and Fort to the effect that Fort should consider the $20 from the previous day a "birthday gift." Three subsequent interviews were held between Frank and Fort. Fort was released from custody on September 17, and signed a cooperating individual agreement on September 22.

McKinney argues that because Frank gave Fort $20, Fort was an undercover agent or employee of law enforcement from August 17 to September 17, 1998. It is correct that Fort was in custody; however, she was not an undercover agent or an employee.

Our review of the August 17, 1998, interview shows that Fort was forthright with Frank regarding the events of January 5 and 6. During that interview, Fort agreed to again meet with Frank to further discuss Kuenning's death. Frank did not give Fort the

---

[57] *State v. Tyma*, 264 Neb. 712, 651 N.W.2d 582 (2002).

$20 until the conclusion of that interview, and there is nothing in the record to suggest that Fort provided the information to Frank in exchange for the funds. The record further shows that Frank emphasized that she could not obtain or develop any information for law enforcement until after her release date. In addition, there is no allegation that Fort obtained or developed information while still in custody. All Fort did was answer questions regarding the events surrounding Kuenning's death. McKinney does not argue that law enforcement may not question potential witnesses to crimes simply because those witnesses are in custody and thus are in a prohibited status, nor would a plain reading of the statute support such an interpretation.

Fort was not acting as an undercover agent or employee of law enforcement when she cooperated with Frank's requests for interviews between August 17 and September 17, 1998. Thus, § 29-2262.01 is inapplicable and the district court did not err in admitting into evidence Fort's testimony.

### 6. THE RELEASE OF GRAND JURY TESTIMONY WAS HARMLESS ERROR

McKinney assigns error relating to the State's disclosure of certain grand jury testimony. Without a district court order, the State provided trial witnesses a copy of that witness' testimony before the grand jury. At trial, McKinney argued that the State violated Neb. Rev. Stat. § 29-1407.01(2) (Reissue 1995) and that the district court should dismiss the indictment against her, grant her motion for mistrial, or give a jury instruction regarding the prosecutorial misconduct.

We note that although McKinney assigns that the district court erred by not dismissing the indictment, she does not argue it. Instead, she argues only that the district court should have either granted a mistrial or given a jury instruction regarding prosecutorial misconduct. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in a party's brief.[58] We will not address the question whether the district court erred by not dismissing the indictment against McKinney.

---

[58] *State ex rel. Lemon v. Gale*, 272 Neb. 295, 721 N.W.2d 347 (2006).

### 7. McKinney Was Not Entitled to a Mistrial or Instruction on Prosecutorial Misconduct Because of the Release of Grand Jury Testimony

██ Section 29-1407.01(2) provides that "[u]pon application by the prosecutor, or by any witness after notice to the prosecutor, the court, for good cause, may enter an order to furnish to that witness a transcript of his or her own grand jury testimony, or minutes, reports, or exhibits relating thereto."

The record establishes, and the State concedes, that it violated § 29-1407.01(2) when it provided witnesses copies of their grand jury testimony. Clearly, the violation occurred when the State failed to obtain an order from the district court. The issue is what consequences should flow from the violation. McKinney argues that the error was structural and that either a mistrial or a jury instruction with regard to prosecutorial misconduct was proper. The State, however, argues that McKinney suffered no prejudice from the violation.

██ This court discussed structural error in *State v. Bjorklund*,[59] where we noted that

> the U.S. Supreme Court defined structural errors as those so "affecting the framework within which the trial proceeds," . . . that they demand automatic reversal and defined trial errors as those "which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." . . . The Supreme Court limited structural errors to a few very specific categories—total deprivation of counsel, trial before a judge who is not impartial, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, and denial of the right to a public trial.

McKinney contends that the error was structural because the release violated the confidentiality and secrecy of the grand jury process.

---

[59] *State v. Bjorklund*, 258 Neb. 432, 504, 604 N.W.2d 169, 225 (2000), quoting *Arizona v. Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).

Contrary to McKinney's assertions, the violation of § 29-1407.01(2) occurred at trial and did not affect the "framework within which the trial proceeds." Thus, the error was not structural. Instead, we conclude that because the error occurred in conjunction with a witness' ability to review his or her grand jury testimony without the express approval of the court, such an error was one which occurred during the presentation of the case to the jury and thus is trial error, subject to a harmless error analysis.

As noted previously, in a jury trial of a criminal case, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant.[60] Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.[61]

The record shows that the State provided McKinney copies of the former testimony and statements of all witnesses and that McKinney had the opportunity to cross-examine each witness and impeach those witnesses on any inconsistencies between the witnesses' statements. The court allowed McKinney to inquire of those witnesses whether the witness had reviewed his or her statements before testifying. Moreover, we note there is no general prohibition to a grand jury witness' actually receiving and reviewing his or her grand jury testimony; in fact, § 29-1407.01(2) expressly provides for such disclosure with the court's permission. We conclude that the guilty verdict entered against McKinney was surely unattributable to the State's violation of § 29-1407.01 and that the violation was harmless error. The district court did not err by not granting a mistrial or refusing to instruct the jury on prosecutorial misconduct.

---

[60] *Iromuanya, supra* note 28.

[61] *Id.*

## V. CONCLUSION

We conclude that the district court erred in not suppressing identifying physical characteristics evidence obtained in violation of the IPCS. However, we conclude that such error was harmless. We further conclude that McKinney's remaining assignments of error are without merit.

AFFIRMED.

HEAVICAN, C.J., not participating.