277 Neb. 565
IN RE INTEREST OF C.H., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE,
v.
C.H., APPELLANT.
No. S-08-261.
Supreme Court of Nebraska.
Filed April 10, 2009.
Matthew A. Headley, Deputy Madison County Public Defender, and Melissa A. Wentling for appellant.
Gail Collins, Deputy Madison County Attorney, for appellee.
WRIGHT, CONNOLLY, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
WRIGHT, J.

NATURE OF CASE
C.H., a minor, appeals his adjudication in the separate juvenile court of Madison County. The court found C.H. to be a juvenile within the meaning of Neb. Rev. Stat. § 43-247(1) and (2) (Cum. Supp. 2006) based on evidence that C.H. sexually assaulted his 5-year-old half sister. Because the court should have suppressed C.H.'s confession, we reverse the adjudication and remand the cause for a new adjudication hearing.

SCOPE OF REVIEW
[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. In re Interest of Dustin S., 276 Neb. 635, 756 N.W.2d 277 (2008).
In reviewing a motion to suppress statements to determine whether an individual was "in custody" for purposes of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), findings of fact as to the circumstances surrounding the interrogation are reviewed for clear error, and the determination whether a reasonable person would have felt that he or she was or was not at liberty to terminate the interrogation and leave is reviewed de novo. State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003).

FACTS
C.H. was 14 years old in October 2007. At that time, he lived with his father, stepmother, and three half siblings. He shared a bedroom with his two half brothers and half sister, ages 8, 4, and 5, respectively. C.H. had his own bed, his half brothers shared the top bunk of a bunk bed, and his half sister, the victim, slept in the bottom bunk.
During the night of October 15, 2007, C.H.'s father heard the girl whimpering in the children's bedroom. When he entered the room, he saw C.H. leaning over her while she slept. C.H. told his father that C.H. thought she had wet the bed. Two days later, on October 17, the girl told their father that C.H. had put tape over her mouth the night before and that her "potty hurt." In response to this statement, the father called the principal at the high school where C.H. was a student and the Madison County Sheriff's Department.
Investigator Richard Drummond with the Madison County Sheriff's Department received the father's call about the allegations. Drummond arranged for the child advocacy center at a hospital in Norfolk, Nebraska, to interview the girl. He also asked Traci Fox, a protection and safety worker with the Department of Health and Human Services, to assist with the investigation.
At the child advocacy center, forensic investigator Kelli Lowe interviewed the girl. The statement given indicated that C.H. put blue tape on her mouth, that he put his hand in her genitalia, that she told C.H. not to do that, and that she did not like it. She also told Lowe that C.H. touched her vagina with his penis.
Lowe showed the girl drawings of a little girl without her clothes on and a little boy without his clothes on and asked her to identify body parts. The girl identified the genitalia of the girl in the picture and the genitalia of the boy in the picture.
After the interview, a physician's assistant employed by the hospital physically examined the girl. At the beginning of the examination, the girl indicated to the physician's assistant that C.H. had touched her in the vaginal area and the anal area with his finger and that he tried to place his penis inside her. During the examination, the girl described other incidents of sexual assault by C.H.
Following the interview and examination, Drummond and Fox went to the school C.H. attended and met with the principal. Drummond spoke to the father about interviewing C.H., and the father did not object to the interview. C.H.'s father and stepmother also expressed that they were not willing to allow C.H. to return to their home following the interview. Before meeting with C.H., Drummond determined that he would detain C.H. and take him to the juvenile detention center in Madison, Nebraska, at the conclusion of the interview.
At the school, the principal brought C.H. to a conference room in the principal's office area. Drummond and Fox entered the room after C.H. The room was a large, well-lit room with tables set up in a U-shape and chairs around the outside of the tables. There was one window to the outside, and the door to the room was on the wall opposite the window. C.H. sat in a chair against the wall near the door between the ends of the U-shaped tables. Drummond sat on one side of the "U," and Fox sat on the other. Drummond was dressed in plain clothes and sat 4 to 5 feet from C.H. The door to the room was unlocked.
Drummond introduced himself and Fox and told C.H. that he was with the Madison County Sheriff's Department. He told C.H. they were going to ask him some questions. The entire interview lasted approximately 30 minutes. The first 10 to 15 minutes consisted of discussing C.H.'s background and family information. Drummond did not tell C.H. that he was free to leave at any time during the interview or that he could terminate the interrogation, nor did he advise C.H. of his Miranda rights.
Drummond conducted the interview in a conversational question-and-answer format, and C.H. answered the questions. Drummond stated that C.H. did not appear tired or under the influence of any medication. He appeared to understand what was going on and did not appear to have any mental problems, to be developmentally delayed, or to have any physical problems indicating discomfort or duress.
After gathering background information, Drummond asked questions about the sexual allegations. Drummond described the conversation as follows:
I told [C.H.] that his sister . . . had spoken to her dad that morning and said that . . . there had been some inappropriate sexual contact and that [she] had gone to the hospital where we had been most of the morning and up until the time that we came and talked to him. That [she] had been interviewed and also had been  and checked physically. And he at that point he began to show some emotion, started . . . weeping a little bit, asked if [she] was okay. Then I asked him if . . . he had had inappropriate contact with her.
C.H. admitted to sexual contact with the girl. C.H. told Drummond the sexual encounters happened quite often.
At the conclusion of the interview, Drummond informed C.H. that he was going to be detained and taken to the juvenile detention center. Drummond transported C.H. to the juvenile detention center in his unmarked police vehicle. C.H. was not restrained and rode in the front passenger seat. Fox rode in the back seat behind C.H.
After C.H. was removed from the family home, his stepmother found blue tape under C.H.'s bed. While C.H.'s father and stepmother were transporting him to an appointment in October 2007, he told them that he "'was guilty.'" When his father asked him if what he told Drummond was true, C.H. started crying and said he was sorry.
On November 13, 2007, C.H. filed a motion to suppress the statements he made to Drummond and Fox. On December 4, the juvenile court held a hearing on the motion. On January 7, 2008, the court overruled C.H.'s motion to suppress.
A trial was held on February 19, 2008, and the parties stipulated to the facts of the case, except that C.H. objected to consideration of his statements to Drummond and Fox. The juvenile court found that C.H. had committed acts which would constitute the felony offense of sexual assault in the first degree and that C.H. had committed acts which would constitute the misdemeanor offense of sexual assault in the third degree. The court adjudged C.H. to be a juvenile within § 43-247(1) and (2) and committed him to the temporary custody of the Department of Health and Human Services, Office of Juvenile Services (OJS), for an evaluation. On March 11, C.H. filed an appeal of his adjudication. On April 7, the court placed C.H. in the temporary legal custody of OJS and in the physical custody of a sex offender treatment group home in South Sioux City, Nebraska.

ASSIGNMENTS OF ERROR
C.H. assigns, restated, that the juvenile court erred in (1) overruling his motion to suppress; (2) finding that the State proved beyond a reasonable doubt that C.H. committed acts which would constitute a felony and a misdemeanor, causing him to be a juvenile within the meaning of § 43-247(1) and (2); and (3) placing C.H. at a juvenile detention center during the pendency of the case.

ANALYSIS

MOTION TO SUPPRESS
C.H. first alleges that the juvenile court erred when it denied his motion to suppress statements he made to Drummond, a law enforcement officer, during the interview at his school. He argues that the court should have suppressed his statements on the grounds that he made the statements during a custodial interrogation and had not been advised of his Miranda rights, thereby violating his Fifth Amendment rights.
In Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court held that authorities must employ procedural safeguards during a custodial interrogation to protect a suspect's privilege against self-incrimination. Specifically, authorities must advise an individual in custody that he has the right to remain silent and the right to an attorney. However, this requirement applies only "`where there has been such a restriction on a person's freedom as to render him [or her] "in custody."'" In re Interest of Tyler F, 276 Neb. 527, 532, 755 N.W.2d 360, 366 (2008) (quoting Oregon v. Mathiason, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)). When a suspect is not in custody, authorities are not required to advise the suspect of his or her rights and may use the statements at trial.
The term "interrogation" encompasses express questioning as well as words or actions by police officers, other than those routine to arrest and custody, that the officers should know are reasonably likely to elicit an incriminating response from the suspect. See State v. Rodriguez, 272 Neb. 930, 726 N.W.2d 157 (2007). In this case, Drummond's interview of C.H. at the school was clearly an interrogation, and it is undisputed that Drummond did not advise C.H. of his Miranda rights. Therefore, the issue presented is whether C.H. was in custody during the interrogation. If C.H. was in custody, the juvenile court erred in failing to suppress the statements he made to Drummond.
An individual is in custody during an interrogation if there is a "` "restraint on freedom of movement" of the degree associated with a formal arrest.'" Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995). Accord Yarborough v. Alvarado, 541 U.S. 652, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). There are two inquiries relevant to determining the degree of restraint on freedom of movement: (1) an assessment of the circumstances surrounding the interrogation and (2) whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.
Id. See, also, State v. Rogers, ante p. 37, 760 N.W.2d 35 (2009); State v. McKinney, 273 Neb. 346, 730 N.W.2d 74 (2007); State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003).
In State v. Rogers, supra, we described many circumstances that the court may assess in determining whether an individual is "in custody." We described eight circumstances that are considered to be most relevant to the custody inquiry. We also cited State v. Mata, supra, in which we found helpful the assessment of six common indicia outlined by the U.S. Court of Appeals for the Eighth Circuit in U.S. v. Axsom, 289 F.3d 496 (8th Cir. 2002). Those factors are:
"(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to [leave], or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong[-]arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6), whether the suspect was placed under arrest at the termination of the questioning."
Id. at 500. See, also, In re Interest of Tyler F., supra; State v. McKinney, supra; State v. Mata, supra. The first three factors are mitigating factors. The presence of these circumstances indicates a suspect was not in custody. The second three factors are aggravating factors, the existence of which make it more likely a suspect was in custody. We recently applied these factors in a juvenile custody inquiry in In re Interest of Tyler F., 276 Neb. 527, 755 N.W.2d 360 (2008).
In In re Interest of Tyler F, a 14-year-old juvenile was adjudicated in juvenile court on allegations of criminal impersonation and disturbing the peace. The charges stemmed from allegations that Tyler F. accessed the Internet and posed as a female acquaintance. He posted a classified advertisement on a Web site, stating that the female was looking to have sexual relations with men. Several men used the contact information provided in the advertisement to call the female or show up at her home. The police ultimately identified Tyler as a suspect and interviewed him at his high school about the Internet post. During the interrogation, Tyler admitted that he had posted the classified advertisement. At trial, he sought to suppress the statements he made to officers, because he was not given Miranda warnings before the interrogation. The juvenile court denied the motion.
On appeal, we analyzed the mitigating and aggravating factors set forth in U.S. v. Axsom, supra, to determine whether Tyler was in custody. The interviewing officers informed Tyler that he was not under arrest. He had unrestrained freedom of movement during the interrogation. He was not handcuffed or physically restrained, and officers did not physically block or prevent his movement. It was less clear whether he "initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions." In re Interest of Tyler F., 276 Neb. at 535, 755 N.W.2d at 368. Although Tyler did not initiate the interview and was escorted to the interview by school security guards, this did not automatically indicate that his responses were not voluntary. In fact, Tyler agreed to talk to the officers after they informed him that he was free to leave. Therefore, all mitigating circumstances indicated that Tyler was not in custody.
Consideration of the aggravating factors also indicated that Tyler was not in custody. Regarding the first aggravating factor, we noted that the officers did not use any strong-arm tactics or deceptive stratagems. They were dressed in plain clothes and did not have firearms drawn. The officers were straightforward with the evidence, and Tyler confessed when the officers informed him they had traced the Internet post to his family computer. Tyler was not placed under arrest at the termination of questioning. Following his confession, Tyler was permitted to return to class.
The evidence supported all three mitigating factors and did not support two of the three aggravating factors. We declined to definitively resolve the question of whether the interrogation atmosphere was police dominated. Weighing the factors, we concluded that the juvenile was not in custody and that use of his statements did not violate his Fifth Amendment rights. In re Interest of Tyler F, 276 Neb. 527, 755 N.W.2d 360 (2008). We reached the same conclusion in State v. McKinney, 273 Neb. 346, 730 N.W.2d 74 (2007), and State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003).
In the case at bar, the factors indicate that C.H. was in custody. Although C.H. had unrestrained freedom of movement during the questioning, Drummond did not advise C.H. that he was not under arrest, that he was free to leave, or that he did not have to talk to Drummond and Fox or answer any questions. Based on our analysis in In re Interest of Tyler F. and because C.H. was not told that he was free to leave and did not have to answer questions, we conclude that C.H. did not voluntarily acquiesce to questioning by law enforcement or social services.
As in In re Interest of Tyler F, C.H. was escorted to the principal's office for the interview, and there is no evidence that he resisted talking to Drummond. However, unlike the juvenile in In re Interest of Tyler F., C.H. did not confess with the assurance and knowledge that he was free to terminate the interview and leave. In situations where authorities initiate contact with a juvenile, an advisement to the juvenile that he has the option to stay and answer questions or terminate the interview is crucial to the determination of whether a statement by the juvenile was voluntary. See In re Interest of Tyler F., supra. Because C.H. was not advised that he was free to leave, we conclude that his statements were not voluntary.
We also find that the third aggravating circumstance was present. Following the interrogation, Drummond placed C.H. in custody and transported him to the juvenile detention center. Even before the interrogation, Drummond had made the determination to place C.H. in custody regardless of whether he confessed.
Assessing the circumstances surrounding the interrogation, we conclude that three factors indicate C.H. was in custody. C.H. was not advised that he was free to leave, his statements to Drummond were not made voluntarily, and he was placed in custody at the conclusion of the interrogation. A law enforcement officer's preinterview decision to take a suspect into custody at the conclusion of questioning is not necessarily fatal to the custody analysis, but the decision to place C.H. in custody following the interrogation prevented Drummond from being able to honestly tell C.H. that he was free to leave. Without this advisement, C.H. did not have the information necessary to make an informed decision as to whether to talk to law enforcement and social services.
C.H. was a 14-year-old high school freshman summoned to the principal's office and questioned by an officer from the sheriff's department regarding serious allegations of sexual assault. He was not told that he was free to leave, and we conclude that someone in C.H.'s position would not believe he was at liberty to terminate the interrogation and leave. C.H. was "in custody" for purposes of Miranda protections. Since he was not advised of his Miranda rights, the juvenile court erred in failing to suppress his confession.

SUFFICIENCY OF EVIDENCE
[6] When considering the sufficiency of the evidence in determining whether to remand for a new trial or to dismiss, an appellate court must consider all the evidence presented by the State and admitted by the trial court irrespective of the correctness of that admission. State v. Delgado, 269 Neb. 141, 690 N.W.2d 787 (2005); State v. Rathjen, 266 Neb. 62, 662 N.W.2d 591 (2003). In the case at bar, the evidence presented by the State and admitted by the juvenile court established beyond a reasonable doubt that C.H. committed acts which would constitute a misdemeanor and a felony, causing him to be a juvenile within § 43-247(1) and (2). Specifically, the evidence shows that C.H. committed acts which would constitute third degree sexual assault, a misdemeanor, and first degree sexual assault, a felony.
Third degree sexual assault occurs when a person subjects another person to sexual contact without the consent of the victim or when the person knew or should have known that the victim was physically or mentally incapable of resisting or appraising the nature of his or her conduct. Neb. Rev. Stat. § 28-320 (Reissue 2008). Pursuant to § 28-320, a sexual assault is third degree sexual assault and is a Class I misdemeanor if the actor does not cause serious personal injury to the victim.
First degree sexual assault occurs when a person subjects another person to sexual penetration without the consent of the victim or when the person knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct. Neb. Rev. Stat. § 28-319 (Reissue 2008). Pursuant to § 28-319, first degree sexual assault is a Class II felony.
Considering all of the evidence regardless of whether it was properly admitted, there was sufficient evidence for the juvenile court to find beyond a reasonable doubt that C.H. committed these acts and was a juvenile within § 43-247(1) and (2). Because the confession should have been suppressed and was a significant part of the evidence upon which the court relied, we cannot say that admission of the confession was harmless. We therefore reverse the adjudication and remand the cause for a new adjudication hearing in which the confession is excluded.

DETENTION DURING PENDENCY OF CASE
C.H.'s final assignment of error, that the juvenile court abused its discretion by placing him at the juvenile detention center during the pendency of the case, is moot. C.H. was placed at the juvenile detention center on October 17, 2007, following his interview with Drummond. He remained at the center until the court placed C.H. in the temporary custody of OJS on April 7, 2008, for placement in a sex offender treatment group home. It was determined that this placement would be in C.H.'s best interests. C.H. is no longer at the juvenile detention center; therefore, we do not need to further address this issue. See In re Interest of Corey P. et al., 269 Neb. 925, 697 N.W.2d 647 (2005).
Because we reverse the adjudication and remand the cause, we note that detention pending adjudication is permitted by Neb. Rev. Stat. § 43-254 (Reissue 2008). Section 43-254 states that "pending the adjudication of any case, if it appears that the need for placement or further detention exists, the juvenile may be . . . (2) kept in some suitable place provided by the city or county authorities."

CONCLUSION
The juvenile court erred in denying C.H.'s motion to suppress his confession. Because the confession was erroneously considered by the court, we reverse the court's adjudication that C.H. was a juvenile within § 43-247(1) and (2) and we remand the cause for a new adjudication hearing.
REVERSED AND REMANDED WITH DIRECTIONS.
GERRARD, J., participating on briefs. HEAVICAN, C.J., not participating.