755 N.W.2d 360 (2008)
276 Neb. 527
In re INTEREST OF TYLER F., a Child Under 18 years of age.
State of Nebraska, Appellee,
v.
Tyler F., Appellant.
No. S-07-554.
Supreme Court of Nebraska.
September 5, 2008.
*364 Richard J. Epstein and Nancy A. Rath, Omaha, for appellant.
Donald W. Kleine, Douglas County Attorney, Emily A. Beller, and Benjamin Pinaire, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
HEAVICAN, C.J.

I. INTRODUCTION
Tyler E, a minor, appeals his adjudication in the separate juvenile court of Douglas County on allegations of criminal impersonation, count I, and disturbing the peace, count II. According to the allegations, Tyler, posing as one Kimberly V., created an Internet posting to attract men interested in sexual encounters. Several men contacted Kimberly, a married mother of two children, using the contact information included in the post. After a bench trial, the juvenile court found counts I and II of the petition to be true and Tyler was found to be a child as defined by Neb. Rev. Stat. § 43-247(1) (Cum. Supp. 2006). This appeal followed. We affirm for the reasons set forth below.

II. BACKGROUND
Early in the fall of 2006, Kimberly and Tyler's family had a dispute for reasons that are not entirely clear from the record. In mid-October of that same year, Kimberly began receiving calls and visits to her home from men who were interested in having sexual relations with her. The men were responding to a message posted under Kimberly's name on "Craigslist," a Web site analogous to the classifieds section of a local newspaper. The Craigslist posting included statements that Kimberly was single and looking to have sexual intercourse with men, and also provided her home address and telephone number. The posting also included photographs of the exterior of Kimberly's home as well as graphic images of women posing nude and engaging in various sexual acts with men.
Kimberly contacted the Omaha Police Department. Officers Paul Milone and Eric Nordby investigated the incident. Based on information supplied by Craigslist and an Internet service provider, the officers determined that the Internet address of the computer used to generate the online posting belonged to Tyler's family's computer. Milone and Nordby then visited Tyler's parents at their home. Tyler's mother told officers that she did not really know how to use the computer. She also stated that Tyler, who was a few months "shy of his 15th birthday at the time, was the member of the household who used the computer most often. She then gave Milone and Nordby permission to speak with Tyler.
Milone and Nordby, dressed in plain clothes, went to Omaha Central High School (OCHS), where Tyler was enrolled. The officers made contact with an Officer Kelly, a uniformed police officer assigned to OCHS. Kelly asked the school's security guards to bring Tyler to his office. The *365 guards contacted Tyler in his biology class and escorted him to Kelly's office. Milone, Nordby, and Kelly were waiting for Tyler inside the office. The office itself is a very small, windowless room. The door to the office was closed during the questioning. Kelly left the room before the questioning began.
By all accounts, the officers questioned Tyler for approximately 20 minutes. The officers never read Tyler his Miranda rights. Tyler initially told the officers that he had no knowledge of the Craigslist posting. However, Tyler eventually confessed after officers explained that the Internet address of the computer used to generate the posting belonged to his family's computer. After confessing to the crime, Tyler was allowed to return to class.
Prior to trial, Tyler attempted to suppress his confession. Milone and Nordby testified for the prosecution at the suppression hearing. Tyler conceded on the witness stand that the officers told him he was not under arrest. Nevertheless, Tyler testified that he did not feel free to leave the interview and that he believed he was obligated to answer the officers' questions. Regarding the details of the interrogation itself, Tyler's account of what transpired differs from the officers' accounts on three key details. First, Tyler testified that he was never told he was free to leave. Milone testified that he and Nordby specifically told Tyler he could leave at any time. Nordby corroborated Milone's testimony. Tyler also testified that the officers threatened to take him into a juvenile detention center for a period of 5 days if he did not "cooperate" with their investigation. Both officers, however, denied that such a threat was ever made. The court specifically credited the officers' testimony in both regards.
Tyler also testified at the suppression hearing that he saw the officers' weapons. However, Milone testified that his weapon was holstered at his hip on his belt and concealed by his suit jacket. Similarly, Nordby testified that he carried his weapon in a shoulder holster near his armpit and that his weapon was also concealed by his jacket during the interrogation. Both officers testified that they did not affirmatively flash their weapons at Tyler. The juvenile court never made a specific finding on this issue, except its more general conclusion that it found "the police officers were credible." It is also worth noting that at one point during the suppression hearing, the juvenile court observed on its own initiative that Tyler is a "large-framed young man." Ultimately, the juvenile court denied Tyler's motion to suppress his confession.
At trial, the prosecution presented testimony from Kimberly and Milone. Kimberly testified that she did not create the Craigslist posting herself. Milone recounted Tyler's confession over a renewed objection from Tyler's counsel. After the prosecution rested, Tyler moved to dismiss count I of the petition because it alleged a violation of "Neb. Rev. Stat. § 28-2608," a code section that does not exist. Tyler also moved to dismiss count II of the petition on the theory that it was third partiesthe anonymous men who contacted Kimberlythat actually disturbed Kimberly's peace, not Tyler.
Regarding count I, the court noted that the language in count I was almost identical to that of Neb.Rev.Stat. § 28-608 (Cum. Supp. 2006) and that an extra "2" was added through clerical error. Accordingly, the court felt that in the interest of justice, count I of the State's petition should be amended to reflect § 28-608 rather than "§ 28-2608." Regarding count II, the court overruled Tyler's motion to dismiss without explanation.
*366 Having disposed of Tyler's motions, the court found Tyler guilty on both counts and ordered him to (1) apologize to Kimberly and her family; (2) refrain from using the Internet, e-mail, or other electronic devices which could send or receive messages of the sort involved in this case; (3) avoid any and all contact with Kimberly or her family; (4) reside in his parents' home and obey all of their rules; (5) have perfect attendance at school and turn in all classwork on time; (6) not associate with anyone not approved of by his parents; and (7) immediately inform his attorney and the court of any changes in his contact information. Tyler appeals his adjudication to this court.

III. ASSIGNMENTS OF ERROR
Tyler assigns, restated, that the juvenile court erred when it (1) overruled Tyler's motion to suppress incriminating statements he made to officers, (2) became a witness on behalf of the prosecution by taking note of Tyler's physical stature, and (3) overruled Tyler's motions to dismiss counts I and II of the prosecution's petition.

IV. STANDARD OF REVIEW
[1-3] Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of the juvenile court's findings.[1] However, when the evidence is in conflict, the appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.[2] In reviewing questions of law, an appellate court reaches conclusions independent of the lower court's ruling.[3]

V. ANALYSIS

1. GROUNDS FOR SUPPRESSING TYLER'S INCRIMINATING STATEMENTS
In his first assignment of error, Tyler contends that incriminating statements he made to officers at OCHS should have been suppressed for two reasons. First, Tyler argues that use of the statements at trial violated his Fifth Amendment rights because he was not given Miranda warnings before officers elicited the confession. Second, Tyler believes the prosecution did not meet its burden to show that Tyler voluntarily made the incriminating statements.

(a) Miranda Implications
[4,5] In Miranda v. Arizona,[4] the U.S. Supreme Court held that authorities must advise suspects that they have certain rights before subjecting them to a "custodial interrogation." If they do not, any incriminating statements obtained during the interrogation are prone to suppression.[5] However, by limiting the sweep of Miranda to cases of custodial interrogation, the Court held that Miranda rights apply only "where there has been such a restriction on a person's freedom as to render him [or her] `in custody.'"[6] In the absence of such restriction, authorities *367 may freely question a suspectand use any resulting statements at trialeven without advising a suspect of his or her Miranda rights. All parties agree that the officers did not advise Tyler of his Miranda rights. The question, then, is whether Tyler was in custody during the interrogation. If Tyler was in custody, then his confession should have been suppressed and its use at trial violated Tyler's Fifth Amendment rights.
[6-8] In resolving whether a suspect was in police custody for Miranda purposes, "`the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"[7] Whether the requisite degree of restraint occurred is to be determined "based on how a reasonable person in the suspect's situation would perceive his [or her] circumstances."[8] In other words, we "must examine `all of the circumstances surrounding the interrogation' and determine `how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'"[9]

(i) Custody Under Axsom
[9] To assist in the circumstantial custody inquiry, we find it helpful to employ a six-factor test[10] which was originally devised by the Eighth Circuit in U.S. v. Axsom.[11] As set forth in Axsom,[12] the six factors are as follows:
"(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to [leave], or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong[-]arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning."
[10] The first three factors of the Axsom test are regarded as "mitigating" factorsthat is, their presence suggests the encounter was noncustodial in nature.[13] In contrast, the latter three factors are considered "aggravating" factors; their presence increases the likelihood that a reasonable person would regard the encounter as custodial.[14] Our review of the record in light of these six factors leads us *368 to conclude that Tyler's encounter with officers at OCHS was noncustodial in nature.
There is no dispute regarding the first mitigating factor. Tyler himself conceded at trial that both Milone and Nordby informed him that he was not under arrest. The evidence also supports the second mitigating factorwhether the suspect possessed unrestrained freedom of movement during questioning. When discussing this factor, courts look for traditional hallmarks of a degree of restraint "associated with a formal arrest."[15] For example, in evaluating the presence of this factor in the case before it, the Axsom[16] court observed that the suspect "was not handcuffed." Similarly, an officer's "physical contact" with the suspectsuch as grabbing or blocking the suspect to prevent or encumber movementmight also preclude a finding that the suspect possessed unrestrained freedom of movement.[17]
There is no evidence that Tyler was handcuffed or physically restrained in any manner during questioning. While the door to the interrogation room was closed, there is no evidence that the door was locked to prevent Tyler from getting outside. Nor is there evidence that officers tried to physically block Tyler from leaving the interview room. In fact, the record shows that Tyler was closest to the doorhe was positioned between it and the officers questioning him. Under our precedent, the mere fact that the questioning took place in an unlocked room is not enough to suggest that Tyler's freedom was restrained. In State v. Mata,[18] we concluded that there was "no evidence of restrictions placed on [Raymond] Mata's movement during questioning" even though Mata was questioned by a pair of officers in an unlocked room at the police station. All of the above supports the conclusion that Tyler's freedom was not restrained during his encounter with officers.
The third mitigating factorwhether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questionspresents a more difficult issue. It is clear that Tyler did not initiate contact with authorities. By all accounts, school security guards located Tyler in class, requested his presence at the school administration building, and escorted him there. However, the fact that a suspect was escorted to the interrogation by authorities does not automatically preclude a finding that the suspect voluntarily acquiesced in the interrogation.
In Mata, officers found Mata at the home of an acquaintance and eventually drove him to the police station for questioning. Nonetheless, we held that Mata voluntarily acquiesced in the questioning because he agreed to speak with officers after being "told at the police station that he could leave at any time."[19]
[11] The record contains contradictory testimony regarding whether Tyler was advised that he could leave at any time. Tyler maintains that he was never told he was free to leave, while Milone testified that Tyler was so advised. The trial court *369 credited Milone's version of the facts. Although we review the record de novo, we may give weight to the trial court's resolution of such inconsistencies.[20] Tyler does not offer any reasons why we should depart from the trial court's resolution of this contradictory testimony. We therefore adopt the trial court's finding that Tyler was told he could leave if he wanted. At the suppression hearing, Tyler admitted that he agreed to speak with the officers. Because he did so after being advised that he was not required to stay, we conclude that Tyler, like Mata, "`voluntarily acquiesced to official requests to respond to questions.'"[21]
[12] The first aggravating factorand the fourth Axsom factor overallasks whether strong-arm tactics or deceptive stratagems were employed during questioning. The record suggests that they were not. Milone and Nordby were dressed in plain clothes and did not have their firearms drawn. Nor did the officers employ any deceptive stratagems. Instead, the officers merely confronted Tyler with the fact that the Internet posting in question had been traced to his family's computer. Tyler confessed when confronted with that simple fact.
Tyler maintains that the officers threatened to send him to juvenile detention if he did not cooperate, but Milone denied this allegation. The juvenile court specifically credited Milone's testimony over Tyler's on this issue. Once again, we see no reason to reject the trial court's determination in that regard. The first aggravating factor is not present in this case.
The record also fails to support the third aggravating factorwhether the suspect was placed under arrest at the termination of questioning. All parties agree that Tyler was permitted to return to class at the conclusion of the questioning.
A legitimate question remains, however, as to whether the second aggravating factorwhether the questioning took place in a police-dominated atmosphereis present. Ordinarily, this factor is triggered by questioning which takes place at a police station house.[22] Tyler was questioned in an office in the administrative area of the school. At least one court has indicated that such a context does not qualify as "police dominated" for Miranda purposes.[23] On the other hand, questioning which takes place behind closed doors in a small, windowless office can be distinguished from environments that are generally not considered "police dominated," such as questioning in a suspect's own home[24] or outdoors in a public place.[25]
We need not definitively resolve this issue, however, because the circumstances show that Tyler was not in custody even if we assume the questioning occurred in a police-dominated atmosphere. Such an assumption would result in a single aggravating factor, yet the record reveals that all three of Axsom's mitigating factors are present on this record. In that respect, this case is identical to the situation in Mata.[26]
*370 Like Mata, Tyler acquiesced in the questioning despite being led to the interrogation by authorities. Neither Tyler nor Mata was restrained during the interrogation, and both individuals were advised that they were not under arrest. No deceptive stratagems or strong-arm tactics were employed in either case. Finally, Mata and Tyler were allowed to leave at the conclusion of questioning. We concluded that Mata's interrogation was not custodial despite the fact that the interrogation took place in an undeniably police-dominated atmosphere. The similarity between this case and Mata confirms that Tyler's interrogation was also noncustodial even if it, too, took place in a police-dominated atmosphere.

(ii) Significance of Tyler's Youth
The only real distinction between this case and Mata for Miranda purposes is the fact that Tyler is a minor. But it is not clear how a suspect's age factors into the custody determination. As a plurality of the U.S. Supreme Court held in Yarborough,[27] "Our opinions applying the Miranda custody test have not mentioned the suspect's age, much less mandated its consideration." The plurality conceded that a suspect's age is relevant when assessing "the voluntariness of a statement,"[28] because that inquiry has been said to depend on "the characteristics of the accused,"[29] including "the suspect's age, education, and intelligence ... as well as a suspect's prior experience with law enforcement."[30] But unlike the voluntariness determination, "the custody inquiry states an objective rule designed to give clear guidance to the police, while consideration of a suspect's individual characteristics including his agecould be viewed as creating a subjective inquiry."[31]
Justice O'Connor wrote separately in Yarborough to emphasize that "[t]here may be cases in which a suspect's age will be relevant to the `custody' inquiry under Miranda."[32] She did not think the suspect's age was relevant in that case, however, because the suspect "was almost 18 years old at the time of his interview."[33] A fair reading of Yarborough therefore compels the conclusion that "[t]he Supreme Court has not definitively ruled on whether a suspect's youth is part of the objective Miranda custody analysis."[34]
The difficulty in resolving this issue stems from an inherent tension between the two legitimate policy interests at stake. On one hand, the blanket declaration that a suspect's age is wholly irrelevant to the custody determination would seem clearly wrong in cases involving a young child. For example, the Fifth Circuit observed in dicta that "[t]he case of an eleven-year-old is different" and that when presented with such a young suspect, "police should have no difficulty recognizing that their suspect is a juvenile and adjusting their determination whether the suspect would understand *371 his freedom of movement to be constrained accordingly."[35]
On the other hand, it would be difficult to take a suspect's age into account in any principled manner. Courts in a number of states apply "a `reasonable juvenile' standard, focusing on the impact of the objective circumstances surrounding the interrogation of a juvenile of specific age."[36] But such a standard may offer more in theory than it does in practice. What, for example, is an officer to make of the difference between a reasonable 16-year-old suspect and a reasonable 13-year-old suspect? As Justice O'Connor observed, "Even when police do know a suspect's age, it may be difficult for them to ascertain what bearing it has on the likelihood that the suspect would feel free to leave."[37]
Moreover, the assumption that all suspects of one particular age are equally sophisticated is almost as unsatisfying as the assumption that all peopleadults and childrenare equally sophisticated. Thus, if a suspect's age is to be taken into account, why not include other "objective circumstances that ... are [also] relevant to the way a person would understand his situation,"[38] such as the suspect's education and intelligence?[39]
But "[o]ne of the principal advantages" of the Miranda rule is that it "`"has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible."'"[40] Consideration of a suspect's age and other factors "would substantially undermine this crucial advantage of the [Miranda] doctrine"[41] by forcing police "to make guesses as to [the circumstances] at issue"[42]  and, as Justice O'Connor observed in her concurrence in Yarborough, the effect of those circumstances"before deciding how they may interrogate the suspect."[43]
[13] In short, there is no easy answer to the issue of whether a suspect's age should factor into the custody assessment. The complexity inherent in this issue suggests that we proceed cautiously in our attempt to answer it. Ultimately, we believe there are two reasons why it would be best to avoid resolving this difficult question today. First, neither party addressed whetherlet alone howa suspect's age should factor into the custody assessment. This is significant because "[s]ound judicial decisionmaking requires `both a vigorous prosecution and a vigorous defense' of the issues in dispute."[44] *372 Second, our ability to dispose of the instant case does not depend on a definitive resolution of this issue. When compared to interrogations in case law from other jurisdictions, Tyler's interrogation would not be custodial even if we took his age into account.
In In re Jason W.T.,[45] the Wisconsin Court of Appeals heard a case involving a police interrogation of a 12-year-old suspect. A uniformed police officer escorted the suspect from class and proceeded to interrogate him in the principal's office. (The principal was not present.) At the outset of its analysis, the court explained:
[I]n applying the objective test, it is appropriate to ask what a reasonable child in [the suspect's] circumstances would understand his situation to be; we cannot see how to apply the objective test in a rational way while overlooking the fact that he is twelve years old and not an adult.[46]
Nonetheless, the court concluded that "there is no question that when the officer began to question [the suspect], a reasonable child in his situation would have understood he was not in custody."[47] The court's conclusion was based on the fact that "[t]he officer told [the suspect] that he was free to go, that he was not under arrest, and that he did not have to talk to him if he did not want to."[48]
The Oregon Court of Appeals used nearly identical reasoning in State ex rel. Juv. Dept. v. Loredo.[49] In that case, a 13-year-old suspect was summoned from his classroom over the school intercom, went to the principal's office, and was interrogated by a single police officer in plain clothes. Relying on its decision in Matter of Killitz,[50] the court explained that its custody assessment must take into consideration "whether a reasonable person in [the] child's positionthat is, a child of similar age, knowledge and experience, placed in a similar environmentwould have felt required to stay and answer all of [the officer's] questions."[51] The court concluded that the police-student encounter was not custodial because "the officer informed [the] child that he was not under arrest, did not have to speak and could leave if he wanted to."[52] Moreover, the court placed some weight on the fact that the officer, much like the officers in this case, "was dressed in plain clothes [with] his gun ... hidden from view under his jacket"[53] and, therefore, had "clearly made an effort to be unimposing in dress and demeanor."[54]
More recently, the Wyoming Supreme Court addressed this issue in CSC v. State.[55] In CSC, officers arrived at a high school to question a 16-year-old suspect for his part in a sexual assault. School officials brought the suspect from his class to a room in the school administration building where three police officers, the *373 school resource officer, and a school official were waiting. The court, citing "Justice O'Connor's reasoning"[56] from her concurrence in Yarborough,[57] "acknowledge[d] that there could be instances where the suspect is so young that his age must be considered by the police."[58] Nevertheless, the court held, "We do not, however, feel that it applies to [the] 16-year-old [suspect] in this case, especially in light of the fact that he was repeatedly advised ... that he was not under arrest, was not obligated to answer ... questions, and could leave at any time."[59] Accordingly, the court concluded that "the interview was noncustodial."[60]
Tyler's encounter with police was in all relevant aspects indistinguishable from the encounters in In re Jason W.T., Loredo, and CSC. Those cases involved interrogations wherein the juvenile suspect was not restrained and was advised by officers that he was not under arrest and could leave the interrogation at any time. As was demonstrated earlier, the same is true in this case. Moreover, the facts here are far less indicative of custody than those present in cases where age-sensitive courts concluded that juvenile-police encounters were custodial.
In Evans v. Montana Eleventh Jud. Dist. Court,[61] the Montana Supreme Court took a 14-year-old suspect's age into account in concluding that he was in custody for Miranda purposes. The suspect "was questioned for two and one-half hours ... by two officers wearing visible badges and weapons."[62] Of note is the fact that "[t]he officers repeatedly suggested that [the suspect] had `more to tell them' and misled him into believing the police had fingerprints from [the victim's] body that could be matched to his" and that "[i]mmediately following the interview, [the suspect] was arrested."[63]
Similarly, in State v. Doe,[64] an age-sensitive court held that a 10-year-old suspect was in custody when he "received a mandatory directive to leave his fifth-grade class and report to the faculty room" and "was not informed by school officials or by the [school resource officer] that he could leave, that he did not have to answer the officer's questions or that he could terminate the questioning at any time."[65]
Finally, in State v. D.R.,[66] a detective dressed in plain clothes interviewed a 14-year-old suspect in a school administrator's office. In concluding that the encounter was custodial, the court placed "significant" weight on the fact that, unlike Tyler, the suspect "was not told he was free to leave."[67]
In sum, this case is similar to cases where age-sensitive courts found police-juvenile encounters to be noncustodial in nature and is distinct from several cases where such courts concluded that the juvenile was in custody. As a result, we are *374 confident that Tyler's youth does not disturb the fact that his encounter with police officers at OCHS was noncustodial. So although we do not rule out the possibility that a suspect's age may factor into the custody assessment in a different case, it is not necessary to resolve that issue here.

(b) Voluntariness of Tyler's Confession
[14] Tyler's next contention is that the prosecution failed to carry its burden to show that he voluntarily confessed to the officers at OCHS. The conclusion that Tyler was not in custody when he confessed means that officers did not violate Tyler's Fifth Amendment right by failing to give him Miranda warnings. But it does not resolve whether Tyler's confession was voluntary. If the confession was given involuntarily, then use of the confession at trial violated Tyler's 14th Amendment due process rights.
[15-17] The prosecution has the burden to prove by a preponderance of the evidence that incriminating statements by the accused were voluntarily given and not the product of coercion.[68] The factors used to determine whether an incriminating statement was voluntarily given include whether
"(1) defendant is in custody at the time of the statement, (2) defendant is alone and unrepresented by counsel, (3) the promise or inducement is initiated by prosecuting officials as opposed to defendant or someone acting on his behalf, (4) defendant is aware of his constitutional and other legal rights, (5) the potentially incriminating statement is part of an abortive plea bargain, (6) the promise or inducement leading to the statement is fulfilled by prosecuting authorities, and (7) defendant is subjected to protracted interrogation or evidence appears on the record to show that coercion precludes the statement from being knowing and intelligent."[69]
An additional factor to consider in making this inquiry is whether the suspect was a minor.[70] Our de novo review of the facts of this case as they relate to the above factors leads us to conclude that Tyler's confession was voluntary.
[18] We have already concluded Tyler was not in custody when he confessed to officers. There is no credible evidence that his confession was induced by any promises on behalf of the police. While officers did not read Tyler his Miranda rights, they were not required to do so because, again, Tyler was not in custody. The police did, however, inform Tyler that he was free to leave. Hence, Tyler was aware of all the legal rights that the officers were required to provide for him. The interrogation was not protracted; by all accounts, the whole encounter lasted no more than 20 minutes.
The only facts that weigh against a finding that Tyler voluntarily confessed are that Tyler was alone and that he was a minor. But our precedent shows that standing alone, these two factors are insufficient to render a confession involuntary.[71] In State v. Garner,[72] for example, police contacted a 15-year-old murder suspect at his grandmother's home. The suspect agreed to accompany police to the police station for questioning. The questioning began at 2:16 a.m. The suspect was questioned, *375 alone, by two officers, until he confessed to the crime at approximately 4 a.m.
In reviewing the above facts, we held that the suspect's confession was voluntary and, therefore, "properly entered into evidence."[73] We see no facts that would preclude the same conclusion here. Accordingly, we conclude that the prosecution met its burden to show that Tyler's confession was voluntarily made and was not the product of coercion.

2. ATTENTION TO TYLER'S PHYSICAL STATURE
[19,20] In his next assignment of error, Tyler contends that the trial court erred when it became a witness in the case for the prosecution during the suppression hearing by taking note of the fact that Tyler is a "large-framed young man." The parties dispute whether that fact is relevant to whether Tyler was in custody or voluntarily confessed to authorities. We find it unnecessary to choose sides in this debate. As our de novo review of both the custody and voluntariness issues shows, it is possible to conclude that Tyler was not in custody and voluntarily confessed without taking his physical stature into consideration. Hence, even if the trial court acted improperly when it took note of Tyler's size, Tyler suffered no prejudice as a result. We have held on countless occasions that error without prejudice provides no ground for relief on appeal.[74] This assignment is without merit.

3. MOTIONS TO DISMISS COUNTS I AND II
In his final assignments of error, Tyler contends that the trial court erred in failing to grant his motions to dismiss counts I and II of the prosecution's petition. We address Tyler's challenge to each count separately.

(a) Count I
[21] At trial, Tyler moved to dismiss count I of the petition because the statute cited therein"Neb. Rev. Stat. § 28-2608" is nonexistent. The juvenile court recognized that the petition should have referred to § 28-608 and amended it on its own initiative. Tyler believes that the juvenile court exceeded its authority when it did so.
In making this argument, Tyler ignores that the erroneous cite in the petition was accompanied by language identical in all relevant respects to the language found in § 28-608. As such, the accidental inclusion of a "2" in the citation could not have misled Tyler as to the nature of the allegation against him. Therefore, Tyler did not suffer prejudice as a result of that clerical error.[75] Again, error without prejudice provides no ground for relief on appeal.[76]

(b) Count II
[22] In his final argument, Tyler contends that the juvenile court erred when it overruled his motion to dismiss count II of the petition. Count II is an allegation for disturbing the peace in violation of Neb. Rev.Stat. § 28-1322 (Reissue 1995). Even assuming he made the Internet postings, Tyler believes that this allegation must be dismissed because it was the anonymous male callers and visitors who actually disturbed Kimberly's peace, not Tyler himself.
Tyler does not really dispute that his Internet posting encouraged and enabled the anonymous males to contact Kimberly. *376 And he fails to cite any supporting authority for the proposition that one who merely encourages and enables third parties to disturb the victim's peace cannot himself be found guilty of disturbing the victim's peace under § 28-1322. Indeed, our own precedent suggests the opposite is true.
In State v. Broadstone,[77] this court discussed the free speech implications of § 28-1322. In the course of its analysis, the Broadstone court observed that the crime of disturbing the peace under § 28-1322 "`is the same as'" the common-law crime of breaching the peace.[78] The Broadstone court further noted that one is guilty of breaching the peace whether he actively engages in unlawful conduct himself or merely uses speech that might encourage others to break the law.[79]Broadstone supports the conclusion that Tyler can be found guilty of disturbing Kimberly's peace under § 28-1322 even though he did not harass her directly. Under the rationale implicit in that case, it is sufficient that Tyler encouraged and enabled others to do so. Accordingly, Foreman's argument regarding count II is without merit.

VI. CONCLUSION
We conclude that the juvenile court correctly denied Tyler's motion to suppress incriminating statements he made to officers at OCHS. The confession was not made while Tyler was in police custody, and therefore, it is of no consequence that officers failed to advise Tyler of his Miranda rights. Moreover, the confession was voluntarily made and not the product of coercion.
The rest of Tyler's arguments are also without merit. Tyler did not suffer prejudice from the juvenile court's decision to take note of Tyler's physical stature. Nor did Tyler suffer prejudice from the court's sua sponte decision to fix the clerical error in the petition. Finally, we conclude that Tyler could be found to be a child defined under § 43-247(1) for disturbing Kimberly's peace by enabling and encouraging others to harass her directly. Having found that all of Tyler's assignments of error and arguments on appeal lack merit, we affirm the juvenile court's judgment.
AFFIRMED.
NOTES
[1] In re Interest of Jeffrey K., 273 Neb. 239, 728 N.W.2d 606 (2007); In re Interest of Brandon M., 273 Neb. 47, 727 N.W.2d 230 (2007).
[2] See In re Interest of Brian B. et al., 268 Neb. 870, 689 N.W.2d 184 (2004).
[3] See In re Interest of Chad S., 263 Neb. 184, 639 N.W.2d 84. 263 Neb. 184, 639 N.W.2d 84 (2002).
[4] Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] See id.
[6] Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). Accord State v. Brouillette, 265 Neb. 214, 655 N.W.2d 876 (2003).
[7] Yarborough v. Alvarado, 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (quoting California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam)).
[8] Yarborough, supra note 7, 541 U.S. at 662, 124 S.Ct. 2140 (citing Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). See, also, State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003).
[9] Yarborough, supra note 7, 541 U.S. at 663, 124 S.Ct. 2140 (quoting Stansbury v. California, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam)).
[10] See State v. McKinney, 273 Neb. 346, 730 N.W.2d 74 (2007).
[11] U.S. v. Axsom, 289 F.3d 496 (8th Cir.2002).
[12] Id. at 500.
[13] See McKinney, supra note 10, 273 Neb. at 364, 730 N.W.2d at 91 (citing Mata, supra note 8). Accord Mata, supra note 8(citing Axsom, supra note 11).
[14] See McKinney, supra note 10, 273 Neb. at 364, 730 N.W.2d at 91.
[15] Beheler, supra note 7. 463 U.S. at 1125, 103 S.Ct. 3517.
[16] Axsom, supra note 11, 289 F.3d at 502.
[17] U.S. v. Nishnianidze, 342 F.3d 6, 14 (1st Cir.2003). See, also, Locke v. Cattell, 476 F.3d 46 (1st Cir.2007); Axsom, supra note 11.
[18] Mata, supra note 8, 266 Neb. at 683, 668 N.W.2d at 466.
[19] Id. at 681, 668 N.W.2d at 465.
[20] See In re Interest of Brian B. et al., supra note 2.
[21] Axsom, supra note 11, 289 F.3d at 500.
[22] See, e.g., Mata, supra note 8.
[23] See People v. Mayes, 202 Mich.App. 181, 508 N.W.2d 161 (1993).
[24] Cf. Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).
[25] See Berkemer, supra note 8.
[26] Mata, supra note 8.
[27] Yarborough, supra note 7, 541 U.S. at 666, 124 S.Ct. 2140.
[28] Id. at 667, 124 S.Ct. 2140.
[29] Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
[30] Yarborough, supra note 7, 541 U.S. at 668, 124 S.Ct. 2140 (citing Schneckloth, supra note 29, and Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963)).
[31] Yarborough, supra note 7, 541 U.S. at 688, 124 S.Ct. 2240.
[32] Id. at 669, 124 S.Ct. 2240 (O'Connor, J., concurring).
[33] Id.
[34] In re I.J., 906 A.2d 249, 262 n. 12 (D.C. 2006).
[35] Murray v. Earle, 405 F.3d 278, 287 (5th Cir.2005).
[36] In re L.M., 993 S.W.2d 276, 288 (Tex.App. 1999) (collecting cases).
[37] Yarborough, supra note 7, 541 U.S. at 669, 124 S.Ct. 2140 (O'Connor, J., concurring).
[38] Id. at 674, 124 S.Ct. 2140 (Breyer, J., dissenting; Stevens, Souter, and Ginsburg, JJ., join).
[39] See Alvarado v. Hickman, 316 F.3d 841 (9th Cir.2002) (collecting cases), rev'd, Yarborough, supra note 7.
[40] Berkemer, supra note 8, 468 U.S. at 430, 104 S.Ct. 3138.
[41] Id.
[42] Id. at 431, 104 S.Ct. 3138.
[43] Id.
[44] Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 572, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (Souter, J., concurring in part and concurring in the judgment) (quoting Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)).
[45] In re Jason W.T., No. 02-0705-FT, 2002 WL 1767211 (Wis.App. Aug. 1, 2002) (unpublished opinion).
[46] Id. at *3.
[47] Id.
[48] Id.
[49] State ex rel. Juv. Dept. v. Loredo, 125 Or. App. 390, 865 P.2d 1312 (1993).
[50] Matter of Killitz, 59 Or.App. 720, 651 P.2d 1382 (1982).
[51] Loredo, supra note 49, 125 Or.App. at 394, 865 P.2d at 1315.
[52] Id. at 395, 865 P.2d at 1315.
[53] Id. at 392, 865 P.2d at 1313.
[54] Id. at 395, 865 P.2d at 1315.
[55] CSC v. State, 118 P.3d 970 (Wyo.2005).
[56] Id. at 978.
[57] Yarborough, supra note 7.
[58] CSC, supra note 55, 118 P.3d at 978.
[59] Id. (emphasis supplied).
[60] Id.
[61] Evans v. Montana Eleventh Jud. Dist. Court, 298 Mont. 279, 995 P.2d 455 (2000).
[62] Id. at 284, 995 P.2d at 458.
[63] Id.
[64] State v. Doe, 130 Idaho 811, 948 P.2d 166 (Ct.App.1997).
[65] Id. at 818, 948 P.2d at 173.
[66] State v. D.R., 84 Wash.App. 832, 930 P.2d 350 (1997).
[67] Id. at 838, 930 P.2d at 353.
[68] State v. Garza, 241 Neb. 934, 492 N.W.2d 32 (1992).
[69] Id. at 945, 492 N.W.2d at 41-42.
[70] See State v. Garner, 260 Neb. 41, 614 N.W.2d 319 (2000).
[71] See, State v. Ray, 266 Neb. 659, 668 N.W.2d 52 (2003); Garner, supra note 70.
[72] Garner, supra note 70.
[73] Id. at 51, 614 N.W.2d at 328.
[74] See, e.g., Betterman v. Department of Motor Vehicles, 273 Neb. 178, 728 N.W.2d 570 (2007).
[75] See Tate-Smith v. Cupples, 355 Ark. 230, 134 S.W.3d 535 (2003).
[76] See Betterman, supra note 74.
[77] State v. Broadstone, 233 Neb. 595, 447 N.W.2d 30 (1989).
[78] Id. at 599, 447 N.W.2d at 33 (quoting State v. Coomes, 170 Neb. 298, 102 N.W.2d 454 (1960)).
[79] See Broadstone, supra note 74 (quoting Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).