IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

MCBURNETT V. NEBRASKALAND TIRE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DANNY MCBURNETT, APPELLANT AND CROSS-APPELLEE,

V.

NEBRASKALAND TIRE, INC., A NEBRASKA CORPORATION, APPELLEE AND CROSS-APPELLANT.

Filed October 6, 2015.    No. A-14-949.

Appeal from the District Court for Scotts Bluffs County: LEO DOBROVOLNY, Judge. Affirmed.

Sterling T. Huff, of Island & Huff, P.C., L.L.O., for appellant.

Dan H. Ketcham and Michael L. Moran, of Engles, Ketcham, Olson & Keith, P.C., for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

PIRTLE, Judge.

### INTRODUCTION

Danny "Jim" McBurnett appeals the order of the District Court for Scotts Bluff County that granted the motion for summary judgment of Nebraskaland Tire, Inc. (NLT), in McBurnett's suit against NLT for disability discrimination under the Nebraska Fair Employment Practices Act (the NFEPA). NLT cross appeals, asserting that McBurnett's suit was not timely filed as to the claimed disability discrimination arising out of the alleged demotion and the alleged failure to accommodate, and that the district court erred in finding that the accommodation issue was included in the Nebraska Equal Opportunity Commission (NEOC) charge. Based on the reasons that follow, we affirm.

- 1 -

BACKGROUND

McBurnett, who was in his mid-40's at the time of trial, has had monocular vision since the age of 17, resulting from a BB gun accident. He has 20/20 vision in one eye, but is blind in the other eye.

Since losing vision in one eye, McBurnett has been able to manage his own hygiene, read, write, hunt, operate all-terrain vehicles, and obtain a permit to own a handgun. However, McBurnett exercises extra caution when operating all-terrain vehicles, hunting, and walking. McBurnett also requires "somewhat longer" to perform certain tasks, such as reading and writing, caring for himself, performing certain manual tasks, and walking through hazardous areas. McBurnett operates his own motor vehicle and has obtained a driver's license, with the requirement that he have two outside mirrors. Monocular vision requires McBurnett to "relearn to do stuff," but, with time, he can do whatever activity he seeks to do.

McBurnett has never applied for Social Security Disability. Before working for NLT, McBurnett had performed work harvesting beets, driving a truck with a box for a custom hay grinder, installing pivots and drilling wells, boxing meat, servicing and delivering tires using a pickup and trailer, and constructing buildings.

McBurnett began his employment with NLT on February 2, 2010, as a commercial tire sales associate with a territory that included parts of Wyoming and Colorado. NLT hired McBurnett for a 3-month probationary period, at the end of which he would receive an evaluation. McBurnett signed NLT's "Conditional Offer of Employment," which provided, "For most positions our offer is also conditional upon you having a valid driver's license in this state and are determined to be insurable by our insurance carrier through a State MVR inquiry." To carry out his duties in the sales position, McBurnett sometimes drove outside the state of Nebraska in a pickup pulling a trailer, the combined weight of which exceeded 10,000 pounds. For smaller deliveries, he only drove the pickup.

In May or June 2010, NLT informed McBurnett that he needed to obtain a United States Department of Transportation (DOT) "medical card" to continue in the sales position. In the event of an accident, NLT's insurer would not cover an employee without a medical card, even if that employee was not at fault. McBurnett attempted to obtain a medical card but was told by a physician that he was unqualified due to his monocular vision.

In February 2011, NLT informed McBurnett that he could no longer serve in the commercial tire sales position without a DOT medical card. NLT offered McBurnett a position as a commercial tire technician, which McBurnett accepted but considered a demotion. After the transfer, McBurnett was not allowed to drive any of NLT's vehicles, whether commercial or non-commercial. In May 2013, immediately after leaving his job at NLT, McBurnett obtained other employment on a construction crew. He does not seek reinstatement at NLT.

On March 14, 2011, McBurnett filed a charge of disability discrimination with both the NEOC and the U.S. Equal Employment Opportunity Commission (EEOC). On November 17, he filed an amended charge. The charge alleged that NLT had demoted McBurnett and treated him differently in the terms and conditions of his employment because of his disability. McBurnett identified February 7, 2011, as the last date NLT allegedly discriminated against him.

On March 19, 2012, the NEOC issued its "Commission Determination," finding sufficient evidence to support a reasonable cause finding that discrimination had occurred regarding the terms and conditions of employment. The NEOC further found that the evidence developed during its investigation failed to support McBurnett's demotion charge under the NFEPA. The NEOC initiated conciliation efforts to resolve the matter of discrimination regarding the terms and conditions of McBurnett's employment, but they were unsuccessful. The NEOC issued an "Administrative Closure" letter on November 16, which administratively closed and dismissed the case.

McBurnett filed his initial complaint in the district court on January 30, 2013. On February 18, McBurnett filed an amended complaint. He asserted that he had a disability which affected major life activities. McBurnett alleged that NLT had violated the NFEPA by discriminating against him on the basis of his disability with respect to the terms, conditions, and privileges of his employment and prevented him from enforcing his statutory rights. McBurnett alleged that he suffered adverse employment actions because of his disability when NLT refused to accommodate him, terminated his employment as a commercial tire sales associate, and demoted him to tire technician. McBurnett further alleged that NLT refused to allow him to operate any of its vehicles without a medical card while other employees and non-employees were allowed to do so. McBurnett sought damages for emotional and financial harm.

NLT's answer admitted that NLT was aware of McBurnett's monocular vision when he was hired, but it denied that McBurnett's monocular vision constituted a "disability" under the NFEPA and that McBurnett was entitled to any damages. NLT affirmatively alleged, inter alia, that McBurnett's causes of actions under the NFEPA were time-barred.

NLT filed a motion for summary judgment on June 5, 2014, and the matter came before the district court on July 23. At the hearing, the parties submitted the evidence summarized above.

On October 10, 2014, the district court granted summary judgment. It found the action was timely filed and that McBurnett had preserved his issues in the preliminary administrative proceedings, but found that McBurnett had failed as a matter of law to present a prima facie case. In essence, the district court held McBurnett's monocular vision was not a disability because it did not substantially limit him in a major life activity. The district court also concluded (erroneously, as we will discuss later in this opinion), that "[a]t the time that McBurnett was unable to get his medical card, there is no evidence to show that [NLT] was aware of his monocular vision . . . so the demotion cannot be based on discrimination, the basis of which was a condition unknown to NLT." The district court did not explicitly state that NLT had a legitimate nondiscriminatory reason for transferring him to another position, but, reasoning with the assumption that NLT initially did not know about McBurnett's monocular vision, it found that McBurnett's inability to obtain a medical card, not his monocular vision, was the reason for the transfer.

McBurnett appeals, and NLT cross-appeals.

ASSIGNMENTS OF ERROR

On appeal, McBurnett generally assigns that the district court erred in granting summary judgment for NLT. McBurnett specifically asserts that the district court erred (1) in failing to find that he had set forth evidence to show that his monocular vision substantially limits his ability to see, work, or engage in any other major life activity when compared to most of the general

population and (2) in finding McBurnett's impairment only became known to NLT because NLT required a medical card.

On cross-appeal, NLT assigns that the district court erred in (1) finding that McBurnett had timely filed suit for alleged disability discrimination arising out of alleged demotion and failure to accommodate, and (2) finding that the accommodation issue was included in the NEOC charge.

Because our analysis of a single issue is dispositive of this case, we do not address all of these assigned errors. See *Papillion Rural Fire Prot. Dist. v. City of Bellevue*, 274 Neb. 214, 739 N.W.2d 162 (2007) (appellate court is not obligated to engage in analysis which is not needed to adjudicate the controversy before it).

## STANDARD OF REVIEW

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Steinhausen v. HomeServices of Neb.*, 289 Neb. 927, 857 N.W.2d 816 (2015). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id.* The grant of a motion for summary judgment may be affirmed on any ground available to the trial court, even if it is not the same reasoning the trial court relied upon. *Olson v. Wrenshall,* 284 Neb. 445, 822 N.W.2d 336 (2012).

## ANALYSIS

McBurnett asserts that the district court erred in granting summary judgment and in basing the verdict in part on the determination that McBurnett's monocular vision did not constitute a disability under the NFEPA (i.e., that McBurnett was not a member of a protected class). We conclude that the district court was correct in determining that McBurnett's monocularity was not a disability under the NFEPA.

The NFEPA makes it unlawful for an employer to ". . . discharge . . . or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's . . . disability." Neb. Rev. Stat. § 48-1104(1) (Reissue 2010). To establish a prima facie case of disability discrimination, a plaintiff must prove that he or she (1) is disabled (or "regarded as" disabled) within the meaning of the NFEPA; (2) is qualified to perform the essential functions of his or her job with or without reasonable accommodation and (3) suffered an adverse employment action under circumstances that give rise to an inference of unlawful discrimination based on disability. *Hutson v. Coviden, Inc.*, 654 F.Supp.2d 1014, 1020 (D.Neb. 2009). See also, *Helvering v. Union Pacific RR. Co.*, 13 Neb. App. 818, 703 N.W.2d 134 (2005) (NFEPA is patterned after the "Americans with Disabilities Act," 42 U.S.C. § 2000e et seq., and it is appropriate to look to federal court decisions construing similar and parent federal legislation).

Neb. Rev. Stat. § 48-1102(9) (Reissue 2010) defines disability under the NFEPA:

> (9) Disability shall mean (a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (b) a record of such an impairment, or (c) being regarded as having such an impairment.

The district court determined that McBurnett's monocular vision did not substantially limit him in a major life activity.

We note that McBurnett's amended complaint was brought solely under the NFEPA, not the ADA. (McBurnett's initial complaint included an ADA claim, but his amended complaint does not.) However, as our antidiscrimination acts are patterned after federal law, and because we find no Nebraska cases addressing whether monocular vision is a disability under the NFEPA, we look to federal decisions for guidance. See *Ventura v. State Equal Opportunity Comm'n*, 246 Neb. 116, 517 N.W.2d 368 (1994). See also, *Helvering v. Union Pacific RR. Co., supra.*

As stated above, under the NFEPA a physical impairment constitutes a disability if it substantially limits one or more of the affected individual's major life activities. § 48-1102(9). Under the ADA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The U.S. Supreme Court has held, however, that it "cannot say that monocularity" per se, causes "a substantial limitation of a major life activity." *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 566-67, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999), *superseded by statute as stated in Bracken v. DASCO Home Medical Equipment, Inc.*, 2014 WL 4388261, 30 A.D. Cases 1002 (S.D.Ohio 2014). The ADA "requires monocular individuals, like others claiming [the ADA's] protection, to prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial." *Id.* at 566. To be "substantially limited" in a major life activity, the person either must be unable to perform such an activity or be significantly restricted as to the condition, manner or duration of that activity when compared to an average person. See *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 193, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), *superseded by statute as stated in Ragusa v. Malverne Union Free School Dist.*, 582 F.Supp.2d 326 (E.D.N.Y. 2008); 29 C.F.R. § 1630.2(i) and (j).

> For monocular vision to substantially limit the major life activity of seeing,
> the impairment must prevent or severely restrict use of his eyesight compared with how unimpaired individuals normally use their eyesight in daily life . . . . Thus, some visual impairment does not necessarily mean that the individual is substantially limited in seeing overall; put differently, it does not follow that seeing as a whole is substantially limited just because the individual has a deficiency in some aspect of vision.

*Equal Emp't Opportunity Comm'n v. United Parcel Serv. Inc.*, 306 F.3d 794, 803 (2d Cir.2002) (emphasis omitted). Additionally, "[t]o be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), *superseded by statute as stated in Ragusa v. Malverne Union Free School Dist.*, *supra.*

We acknowledge that after the foregoing cases were decided, the ADA Amendments Act of 2008 ("ADAAA"), Pub.L. No. 110-325, 122 Stat. 3553, which became effective January 1, 2009, relaxed the standard for what constitutes a disability under the ADA. Congress determined that courts had "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect." Pub.L. No. 110-325, 122 Stat. 3553. Accordingly, Congress stated that the term 'substantially limits' should

be interpreted broadly to provide wide coverage. *Id.* Moreover, the "impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.1(j)(1)(ii). Rather, the impairment need only "substantially [limit] the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.*

Despite the changes wrought by the ADAAA, the NFEPA's standard has remained the same. Nebraska has not amended the NFEPA to remain coextensive with the ADAAA's broadened scope of what is meant by disability. The relevant conduct in this case occurred after the amendments took effect in 2009. So, if McBurnett had made a federal disability claim, we would analyze it with the amendments in mind, but McBurnett's claim is a state law claim. Accordingly, we may construe McBurnett's state law claim with guidance from, inter alia, the approach taken by federal courts before the aforementioned amendments took effect. *But see Marshall v. Eyecare Specialties, P.C. of Lincoln*, 291 Neb. 264, 865 N.W.2d 343 (2015) (citing the ADAAA definition of disability but not deciding the issue of whether the plaintiff had a disability under the NFEPA).

In *Knutson v. Schwan's Home Service, Inc.*, 870 F.Supp.2d 685 (D.Minn. 2012), decided after Congress enacted the more lenient definition of disability, the plaintiff's employment was conditioned on being able to pass a DOT commercial vehicle fitness test. The plaintiff delivered his employer's product using the employer's delivery truck and his personal vehicle. Subsequently, an eye injury caused the plaintiff to lose most of his sight in his left eye, rendering him unable to pass the DOT's tests. Even though the plaintiff could not drive commercial vehicles because of his inability to pass the DOT's tests, the court, applying the amended definition of disability set forth in the ADAAA, found that his vision impairment did not constitute a disability. The plaintiff continued to drive and he provided no "evidence that he had a loss of depth perception or visual acuity."

Similarly, the plaintiff in *Mota v. Aaron's Sales & Lease Ownership*, 2012 WL 3815332, 45 NDLR P 245 (E.D. Pa. 2012), had monocular vision, but the court held that it was not a disability. In that case, the plaintiff's manager trainee job involved driving a delivery truck for several hours a day. The job required a medical certification for commercial drivers from the state DOT, which certification the plaintiff was ultimately denied due to his monocular vision. Without the state DOT certification, the plaintiff was unable to perform his job duties and was terminated. There was evidence that the plaintiff had admitted that his vision did not affect his daily life, and the plaintiff was only limited from the narrow class of jobs of driving commercial vehicles. The court granted defendant's motion for summary judgment because the plaintiff's impairment did not substantially limit him in the major life activity of working.

We recognize that the court in *Mota* never mentioned the ADA amendments and relied upon pre-amendment caselaw. However, one commentator notes:

> In [*Mota*], the district court quoted *Sutton* for its analysis of the major life activity of working: "To be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Id.* [at 4] (quoting *Sutton*, 527 U.S. at 492).

> Oddly enough, this standard from *Sutton* conforms quite well to the current Interpretive Guidance of the EEOC's regulations. Those guidelines state that "[d]emonstrating a substantial limitation in performing the unique aspects of a single . . .

job is not sufficient to establish that a person is substantially limited in the major life activity of working." Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630 app. § 1630.2(j)(5) and (6) (2014). Because both *Sutton* and the guidelines are similar in this situation, the end result would probably have been the same regardless of which rule the court applied.

THE ADA AMENDMENTS ACT OF 2008: WHY THE QUALIFIED INDIVIDUAL ANALYSIS IS THE NEW BATTLEGROUND FOR EMPLOYMENT DISCRIMINATION SUITS, 67 Okla. L. Rev. 111, 145 (2014).

In light of the foregoing, we address whether the district court erred in finding that McBurnett's monocularity was not a disability under the NFEPA and in granting NLT's motion for summary judgment. A party makes a prima facie case that it is entitled to summary judgment by offering sufficient evidence that, assuming the evidence went uncontested at trial, would entitle the party to a favorable verdict. *Doe v. Board of Regents*, 287 Neb. 990, 846 N.W.2d 126 (2014). After the movant for summary judgment makes such a prima facie case, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion. *Id.* We conclude that NLT presented evidence that McBurnett's monocular vision did not constitute a disability under the NFEPA in that it did not substantially limit his ability to see, work or engage in any other major life activity when compared to most people in the general population and that he is not "regarded as" disabled. As such, NLT demonstrated that McBurnett did not satisfy the first prong of a prima facie case of disability discrimination as a matter of law, and McBurnett has not set forth any testimony, documentation or other evidence that would raise a material issue of fact on the issue.

The evidence shows that since losing vision in one eye, McBurnett has been able to manage his own hygiene, read, write, hunt, operate all-terrain vehicles, and obtain a permit to own a handgun. Some of these activities require McBurnett to exercise "extra caution" and take "somewhat longer" for McBurnett to perform. McBurnett must "relearn to do stuff," but, in a short time, he can do whatever activity he seeks to do. McBurnett operates his own motor vehicle and has obtained a driver's license, with the sole restriction that he have two outside mirrors.

McBurnett has never applied for Social Security disability benefits. Before working for NLT, McBurnett had performed work harvesting beets, driving a truck with a box for a custom hay grinder, installing pivots and drilling wells, boxing meat, servicing and delivering tires using a pickup and trailer, and constructing buildings.

With the exception of driving a vehicle exceeding 10,000 pounds, the record does not show that McBurnett is "significantly restricted" as to the condition, manner or duration of any of the activities above when compared to an average person. See *Toyota Motor Mfg., Ky., Inc. v. Williams, supra, superseded by statute on other grounds as stated in Ragusa v. Malverne Union Free School Dist., supra.* Moreover, there is no evidence of the actual limits his monocularity imposes on his peripheral vision and depth perception. Even though McBurnett is restricted from driving a vehicle exceeding 10,000 pounds, he is not substantially limited in the major life activity of working because he is only precluded from one type of job. See *Sutton v. United Air Lines, Inc.*, *supra, superseded by statute as stated in Ragusa v. Malverne Union Free School Dist., supra.*

McBurnett argues that by not allowing him a medical card or a commercial driver's license, the State of Nebraska and the federal government are "regarding" him as having an impairment that substantially limits a major life activity. McBurnett alleges that NLT has done the same by demoting him. However, the evidence shows that until McBurnett's monocular vision prevented him from obtaining a medical card, NLT, although aware of McBurnett's monocular vision, was aware of no practical limits on McBurnett's work; NLT did not "regard" him as impaired but rather transferred him out of a position which required him to obtain a DOT medical card. Furthermore, as the foregoing caselaw demonstrates, an employee who is precluded from obtaining a DOT medical card because of monocularity is not per se disabled. See *Mota v. Aaron's Sales & Lease Ownership, supra*.

We digress to note McBurnett's argument that the district court erred in granting summary judgment because the verdict was based on an incorrect assessment of the evidence. Specifically, the district court found that "[a]t the time that [McBurnett] was unable to get his medical card, there is no evidence to show that [NLT] was aware of his monocular vision . . . so the demotion cannot be based on discrimination, the basis of which was a condition unknown to [NLT]." As McBurnett asserts, this finding is not supported by the record. NLT admitted in its answer that it was aware of McBurnett's monocular vision at the time he was hired for the tire sales position. Nevertheless, the district court did not base its ultimate decision only on whether NLT knew about McBurnett's monocular vision, and in light of our conclusion that there is no genuine issue of material fact that McBurnett failed to prove the disability element of a prima facie case, we conclude that McBurnett suffered no prejudice and that the district court's incorrect assessment of these facts amounted to harmless error. See *In re Interest of Tyler F.*, 276 Neb. 527, 755 N.W.2d 360 (2008) (error without prejudice provides no ground for relief on appeal). *See also, Olson v. Wrenshall, supra* (grant of motion for summary judgment may be affirmed on any ground available to trial court, even if it is not same reasoning trial court relied upon).

Our finding that McBurnett's monocular vision did not constitute a disability under the NFEPA is dispositive of the instant case, and we decline to address additional issues raised by the parties. See *Papillion Rural Fire Prot. Dist. v. City of Bellevue*, 274 Neb. 214, 739 N.W.2d 162 (2007) (appellate court is not obligated to engage in analysis which is not needed to adjudicate the controversy before it).

CONCLUSION

Upon our review of the evidence, we find that there are no genuine issues of material fact and that NLT was entitled to judgment as a matter of law.

AFFIRMED.